# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LAWRENCE WASHINGTON JR., individually and as next friend of five minor children, TAYLOR WASHINGTON, MORGAN WASHINGTON, CHLOE WASHINGTON, MADISON WASHINGTON, LAWRENCE WASHINGTON; CHRISTINA GODIN, individually and as next friend of three minor children, ANGEL ARRAND, AUSTON ARRAND, WILLIAM ZIETZ III; ROOSEVELT CAMERON; DEBORAH SMITH; ABY NDOYE and ROBIN DAVIS, all on behalf of themselves and a class of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) Case No. 16-cv-11247 Hon. John Corbett O'Meara **SECOND AMENDED CLASS ACTION COMPLAINT** |
| *Plaintiffs,* | ) ) ) **JURY TRIAL DEMANDED** |
| - against - | ) ) |
| GOVERNOR RICHARD DALE SNYDER, DENNIS MUCHMORE, in their individual and official capacities, the STATE OF MICHIGAN, the MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY, the MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, ANDREW "ANDY" DILLON, R. KEVIN CLINTON, DANIEL WYANT, NICK LYON, in their individual capacities, LIANE SHEKTER SMITH, STEPHEN BUSCH, PATRICK COOK, MICHAEL PRYSBY, BRADLEY WURFEL, MIKE BROWN, ED KURTZ, DARNELL EARLEY, GERALD AMBROSE, DAYNE WALLING, HOWARD CROFT, MICHAEL GLASGOW, LIANE SHEKTER SMITH, STEPHEN BUSCH, PATRICK COOK, MICHAEL PRYSBY, BRADLEY WURFEL, EDEN WELLS, LINDA DYKEMA, NANCY PEELER, ROBERT SCOTT, in their individual and official capacities, ROWE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

{00019380 1 }

| | |
|---|---|
| PROFESSIONAL SERVICE COMPANY, a Michigan Corporation, LOCKWOOD, ANDREWS & NEWNAM, INC. a Texas Corporation, LOCKWOOD, ANDREWS, & NEWNAM P.C., a Michigan Corporation, LEO A DALY, a Nebraska Corporation, VEOLIA NORTH AMERICA, INC., a Delaware Corporation VEOLIA NORTH AMERICA, LLC., a Delaware limited liability company, VEOLIA NORTH AMERICA OPERATING SERVICES, LLC, a Delaware limited liability company, EACH, a wholly owned subsidiary of VEOLIA ENVIRONNEMENT S.A., a French transnational Company, and the CITY OF FLINT, a municipal corporation, jointly and severally. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) ) ) |

## SECOND AMENDED CLASS ACTION COMPLAINT

### *INTRODUCTION*

### Mass Poisoning and Destruction of Infrastructure of the City of Flint

1.     This case arises from the now infamous poisoning and damage to the property of the Flint residents caused by the State of Michigan' mandate that the City of Flint switch from being a purchaser of the safe Detroit Sewer and Water Department ("DSWD") water, in order to bill for and collect money by becoming purveyors of corrosive and unsafe water which was sold to the Flint residents at a profit and at price gouging rates from the free Flint River.

2.     This occurred because the City of Flint had a run of the mill municipal fiscal

crisis, which resulted in the State of Michigan appointing an Emergency Manager under the Emergency Manager Statute, ("EM Statute").

3.      The mass poisoning and destruction of infrastructure was not caused by an environmental crisis.

4.      Rather, this mass poisoning and destruction of infrastructure occurred as the result of an emergency fiscal plan ("Emergency Fiscal Plan") conceived and executed by the below mentioned Michigan authorities to remedy the fiscal crisis in Flint by making Flint into a profit making purveyor of water and then, selling the dangerous and unsafe Flint River water to Flint residents with depraved indifference for their health, safety and welfare.[1]

5.      As a result of this Emergency Fiscal Plan the Flint River unsafe water sales yielded to the EM and State controlled City of Flint roughly 50 million dollars and saved additional millions of dollars for safe water which had, for half a century, been purchased from DWSD by the City of Flint while under control of its City elected representatives.

6.      In testimony before the United States of America House Oversight and Government Reform Committee hearing regarding the Flint water crisis Snyder, on

---

[1] Governor Snyder ("Snyder"), State Treasurer Dillon ("Dillon"), State Treasurer Clinton ("Clinton"), State Treasurer Clinton ('Clinton"),  the State of Michigan, The Michigan Department of Environmental Quality ("MDEQ"), and The Michigan Department of Human Health and Services ("MDHHS"), their agents, servants and employees, the appointed Emergency Managers Mike Brown, Ed Kurtz, Darnell Earley, and Gerald Ambrose (" Emergency Managers"), the City of Flint and it's employees, Dayne Walling ("Walling"), Howard Croft ("Croft"), and Michael Glasgow.

March 17,  2016 admitted under oath that  "this was a failure of government at all levels, the State of Michigan and local, state and federal officials we all failed the families of Flint."

7.     On January 19, 2016 Snyder, in his State of the State address, admitted as to the residents of Flint, "the buck stops here with me, I take full responsibility, I give you my commitment that Michigan will not let you down."

<u>**Racism Motivated the State's Fiscal Emergency Plan including**</u>
<u>**Price Gouging**</u>

8.     The poisoning, exposure and re exposure of the predominately non-white residents of Flint, Michigan to unsafe Flint River water, which they were forced to purchase at highest rates in the United States, and more than previously paid for DWSD water, occurred because these Emergency Managers, with the approval and authority of  the State of Michigan, Snyder,  Dillon, Clinton, and the MDEQ, focused, in their Fiscal Emergency Plan,  solely on their duty under the Emergency Manager statute to find a financial solution for the City of Flint financial crisis, while breaching, with depraved indifference, their additional duty to protect the public health, safety and welfare of the Flint residents, as mandated by the Emergency Manager Statute. (Local Financial Stability and Choice Act, Act 436 of 2012).

9.     The Michigan Legislature never intended for an Emergency Manager to

solve fiscal problems by means that endangered the public welfare, health, and safety, as was done in Flint by the sale of unsafe Flint River water at monthly rates that were the highest in the United States.

10.   The Legislative intent made clear both in the Preamble and the body of the Emergency Manager bill, which the Legislature sent to the Governor for signature, that the protection of the public health, safety, and welfare was an express priority linked to any fiscal remedial steps. (Michigan Enrolled House Bill No. 4214, Effective Date March 16, 2011 By the Legislature, legislative bill precursor to 2012 Signed Emergency Manager Law Art. 436 of 2012).

11.   This Emergency Manager/state authorized depraved indifference was fraught with racism since, of the 6 municipalities through which the Flint River flowed, all of which had heretofore purchased safe DWSD water, only one community, the primarily non-white City of Flint, was caused to disconnect from the safe DWSD water and connect to the unsafe Flint River.

12.   The other 5 communities, all of which were primarily white, and through which the Flint River flowed, did not change their water source from DWSD to the Flint River, nor did any other community in Genesee County, and did not become for profit water purveyors, even though these sales would have also yielded these 5 communities additional revenues of millions of dollars, and savings of additional millions of dollars by foregoing the cost of purchases for their water from DWSD

during this period of time.

13.    The other 5 communities through which the Flint River flowed, had the following racial demographics:

a.)    The City of Montrose Michigan was 98.7% white and remained on safe DWSD water.

b.)    The City of Flushing Michigan was 94.8% white and remained on safe DWSD water.

c.)    The Township of Flushing Michigan was 87.5% white and remained on safe DWSD water.

d.)    The City of Columbiaville Michigan was 95.2% white and remained on safe DWSD water.

e.)    The City of Lapeer Michigan was 88.6% white and remained on safe DWSD water.

14.    In an overtly racist move,  the City of Flint,  which was 65.4% non-white, was forced to disconnect from safe DWSD water and to purchase the unsafe Flint River water at the unconscionably highest rates charged for water in the United States.

15.    This overtly racist maneuver yielded roughly 50 million dollars by selling unsafe water at the highest rates in the United States to the predominately non-white population of the City of Flint.

16.     These high water rates were charged despite the fact that the City of Flint median household income was nearly the lowest level in Michigan.

17.     Historically, and for approximately 50 years, the City of Flint, like its 5 primarily white neighbor communities, residents had paid for clean, safe and properly treated drinking water which it purchased from DSWD.

18.     Snyder, Dillon, Clinton, the State of Michigan,andMDEQ, approved the Emergency Fiscal Plan conceived by the Emergency Managers and others in both 2012 and 2013 to force the primarily non-white City of Flint to disconnect from the safe DWSD water, and to connect to and sell to the primarily non-white Flint residents, the historically unsafe Flint River water.

19.     The State of Michigan never intended to use the free water of the Flint River as a permanent solution, as it certainly would have, had the Flint River been safe to use as drinking water.

20.     Before the Emergency Manager proposed this Emergency Fiscal Plan and it was approved by Snyder, Dillon, Clinton, and MDEQ, all the aforesaid had no data establishing that the water was potable and safe.

21.     Rather, the only information, from prior studies, which the Emergency Managers, the State of Michigan, Snyder, Dillon, Clinton, and MDEQ had about the Flint River water, was that it was unsafe and dangerous to the Flint residents and to the City of Flint's water delivery infrastructure.

22.     Nevertheless, the switch to this free Flint River water for sale as safe and potable was approved and forced upon the City of Flint and its primarily non-white residents, as part of the Emergency Fiscal Plan by State authorities with depraved indifference to the health, safety and welfare of the predominately non-white citizens of Flint, and with depraved indifference to the known endangerment of the structural integrity of the City of Flint's water delivery infrastructure.

23.     During the roughly 2 years that the City of Flint was connected to the Flint River pursuant to the Emergency Fiscal Plan, Snyder, Dillon, Clinton, MDEQ, MDHHS, and their named defendant employees, t Walling, Croft, and Glasgow,= of the City of Flint,  Veolia North America Inc., Veolia North America LLC., Veolia North America Operating LLC., and Veolia Environnement S.A.  ("Veolia"), Rowe Professional Service Company, ('Rowe"),  Lockwood Andrews & Newnam, Inc., and Lockwood, Andrews, & Newnam P.C. a subsidiary of Leo A Daly ("LAN"), made false and repeated statements and misrepresentations that the Flint River water being sold to the City of Flint was safe.

24.     These misrepresentations were made despite the aforesaid Defendants' own independent testing which established that water from the Flint River was unsafe for sale or consumption and that it endangered the structural integrity of the City of Flint's water delivery infrastructure.

25.    The citizens of Flint justifiably relied on these representations and misrepresentations that the Flint River water was both safe and potable.

26.    The citizens of Flint justifiably relied on the implied warranties in the written purchase/sales contracts and bills for water sold and delivered from the Flint River to the citizens, that the Flint River water was both safe and potable.

27.    Through the Emergency Managers, Snyder, Dillon, and Clinton, the State of Michigan completely subsumed the authority of the local government of Flint under PA 436 and left the Flint local, elected municipal authorities powerless to stop this racially motivated price gouging, endangerment to the public health, safety, and welfare of the citizens of Flint, and the endangerment of the structural integrity of the Flint water delivery system infrastructure.

28.    The State of Michigan, its Emergency Managers, MDEQ, MDHHS, and the Environmental Protection Agency ("EPA") District 5, had knowledge and power to prevent this tragic occurrence.

29.    Rowe, LAN, and Veolia had knowledge and power to prevent this tragic occurrence.

30.    As a result of the coordinated, systematic, and continuous acts of Snyder, Dennis Muchmore ("Muchmore"), Dillon, Clinton, the Emergency Managers, the MDEQ, and the MDHHS and their employees, Rowe, LAN and Veolia, catastrophic harm has been inflicted and perpetuated on the residents of Flint and

the City of Flint infrastructure.

## Destruction of Flint Infrastructure and Lead Poisoning

31. The Flint River water contained a highly concentrated corrosive agent.

32. The delivery of the corrosive agent in the Flint River into the Flint water delivery infrastructure destabilized the metallurgical integrity of the said infrastructure and thereby caused the Flint property values to plummet of the citizens of Flint.

33. The delivery of the corrosive agent in the Flint River into the Flint water delivery infrastructure destabilized the metallurgical integrity of the said infrastructure and thereby caused the Flint businesses' value to plummet.

34. The delivery of the corrosive agent in the Flint River into the Flint water delivery infrastructure destabilized the metallurgical integrity of the said infrastructure by stripping the lead and iron from the previously stable metal pipes such that the element of lead contained therein was sent through the taps and to all the citizens of Flint.

35. The delivery of the corrosive agent in the Flint River into the water delivery infrastructure destabilized the metallurgical integrity of the said infrastructure by stripping from the previously stable metal pipesthe elements of lead and iron, causing lead and iron to be sent through the taps of all the homes, businesses and other facilities, causing exposure and re exposure to all Plaintiffs, and also causing

dramatic increases in bursting pipes and progressively corroding, weakening and destroying the Flint water delivery system infrastructure.

36.     The effects of exposure and re-exposure to lead of infant children and adults are long lasting and are devastating.

37.     Lead is a powerful neurotoxin that has devastating, irreversible lifelong impacts on the development of children, exposes unborn infants in utero, and also causes irreparable injury to adults.

38.     There is no safe level of lead as its effects are harmful even at low levels.

39.     Lead exposure and re exposure in children and in utero,  and  heightened levels of lead in the blood and body, result in injuries not limited to decreased IQ, behavioral problems, cognitive impairment, attention deficit disorder, irreversible brain damage, learning disabilities, hearing impairment, lack of executive functioning, impaired balance and nerve function, infections, skin problems, digestive problems, loss of earnings, need for vigilant and lifelong medical monitoring and treatment, and psychological disorders.

40.     Lead also causes serious health effects in adults, including digestive, cardiovascular, and reproductive problems, kidney damage, dizziness, fatigue, weakness, depression and mood disorders, diminished cognitive performance, nervousness, irritability, and lethargy.

## Rico Fraudulent Scheme

41.    The Emergency Fiscal Plan constituted an intentional fraudulent scheme under the Racketeer Influenced and Corrupt Organizations Act  pursuant to 18 U.S.C. Sec 1962 (c), and (d), ("Rico") to force the City of Flint to contract with and eventually connect to the Karegnondi Water Authority ("KWA"), which was then, and now continues to be under construction and was not due to be completed for roughly two and one half years.

42.    The Emergency Fiscal Plan constituted an intentional fraudulent scheme under Rico to exploit the roughly two and one half year known waiting period for completion of the KWA, by selling, at price gouging rates, the known unsafe, dangerous water from the free Flint River to the primarily non-white, poor residents of the City of Flint, until over roughly $50 million dollars could be generated.

43.    Pursuant to the Emergency Fiscal Plan, individual Rico defendants coordinated a scheme with the Rico enterprise actors to profiteer from the Flint fiscal crisis by installing Emergency Managers, who reported to defendants Snyder, Dillon and Clinton, and who had the power to bypass and override the decisions of the duly elected Flint city government, thereby enabling them to execute the Emergency Fiscal Plan during this known roughly two and one half year waiting period until the KWA was completed.

44.    The individual Rico defendants knew they could execute this fraudulent

scheme because they had divested the city of Flint of all legal self-determination.

45.     In other words, neither the Flint mayor nor Flint City Council had the power to override the Emergency Manager decision.

46.     The Emergency Fiscal Plan of the Rico defendant Emergency Managers as approved by Rico defendants Snyder, Dillon and Clinton, caused Flint to switch from being a water purchaser of safe water from DWSD to a water purveyor and end user of unsafe, dangerous Flint River water, until the end game of this fraudulent scheme; the forced connection of the City of Flint to the under construction KWA.

47.     On information and belief, based in part on the 2009 documents which initially incorporated the as yet unbuilt KWA, certain Defendants, including some of the named Rico defendants and Rico enterprise actors, stood to reap profits from building the KWA and then, years later, from compelling the City of Flint to enter a contract with the KWA to purchase water from this start up new water source.

48.     The named Rico defendants along with the Rico enterprise actors, and employees of the MDEQ, the MDHHS, and the city of Flint water treatment plant employees, systematically and in a coordinated manner represented, despite having knowledge of facts to the contrary, that safe and potable water from the Flint River could be delivered throughout the Flint water delivery infrastructure, leaving the infrastructure intact.

49.     The Rico defendants and enterprise actors knew that their Rico Emergency Fiscal Scheme could never have been safely undertaken, as the delivery of known corrosive agents from the Flint River into the infrastructure would have destroyed the metallurgic structural integrity of the Flint water delivery infrastructure.

50.     Despite this knowledge, with recklessness and depraved indifference to the consequences to the population and to the city infrastructure, the Rico defendants and Rico enterprise actors implemented this Rico Emergency Fiscal Scheme.

51.     In order to keep this scheme continuing in excess of 2 years, thereby price gouging and collecting roughly $50 million as purveyors of the unsafe Flint River water, while waiting out the clock until the Rico Defendants and Rico enterprise actors could connect, as part of their Rico Emergency Fiscal Scheme, to the as yet uncompleted, under construction, KWA, the Rico defendants and Rico enterprise actors engaged in a coordinated and systematic effort of denials and misrepresentations, over the objections, complaints, civil uprisings, and demonstrations, by the citizens of Flint regarding the safety of the Flint River water.

52.     The property and business owners in the city of Flint justifiably relied upon these intentional false representations and misrepresentations of the Rico defendants and Rico enterprise actors to their detriment causing the value to their property to plummet.

53.     The Rico defendants' and Rico enterprise actors' actions were done with a

depraved indifference to the health, safety, welfare and property of the predominately non-white citizens of Flint.

54.     In furtherance of this Rico Emergency Fiscal Scheme, the City of Flint, under the State's control, was forced to commit predicate acts of both mail and wire fraud.

55.     Rico defendants used the Unites States Postal Service to send monthly bills for unsafe water, and used the Federal banking wire system to collect these water bills.

56.     Pursuant to this Rico Emergency Fiscal scheme the City of Flint, under control of the Emergency Managers appointed by and controlled by the State of Michigan, Snyder, Dillon, and Clinton, collected roughly 50 million dollars under their predatory pricing and billing for unsafe water.

57.     The citizens of Flint relied on the implied warranty of the merchantability and fitness for a particular purpose as contained in their contracts/bills for Flint water.

## **PARTIES**

58.     Plaintiffs have, and have at all times relevant herein been residents of Flint Michigan.

59.     Defendants are named and described in the caption of this action.

60.     Defendant the State of Michigan directs, controls, and operates defendant the Michigan Department of Environmental Quality ("MDEQ").

{00019380 1 }

61.    Defendant the State of Michigan directs, controls and operates defendant the Michigan Department of Health and Human Services ("MDHHS").

62.    Defendant Richard Dale Snyder ("Snyder") is the Governor of the State of Michigan, and is sued in his individual and official capacity.

63.    Snyder was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.

64.    Defendant Andrew "Andy" Dillon ("Dillon") was the former Treasurer of the State of Michigan from 2011 to 2013, after which he served in an advisory capacity to the subsequent Michigan State Treasurer, R. Kevin Clinton. He is sued in his individual capacity.

65.    Dillon was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.

66.    Defendant R. Kevin Clinton ("Clinton") was the former Treasurer of the State of Michigan subsequent to Defendant Dillon, and is sued in his individual capacity.

67.    Clinton was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.Defendant Dennis Muchmore ("Muchmore") was Snyder's Chief of Staff, and is sued in his individual and official capacity.

68.    Defendants Mike Brown, Ed Kurtz, Darnell Earley, and Gerald Ambrose

("Emergency Managers") at all times relevant herein were acting within and outside the scope of their employment and/or authority under color of law.

69.     The Emergency Managers are sued in their individual and official capacities.

70.     Defendant Emergency Managers continuously controlled all of the Flint governmental functions, decisions and fiscal decisions from December 2011 through April 30, 2015 pursuant to Statute and reported to Snyder, Dillon and Clinton.

71.     Defendant City of Flint is a municipal corporation located in Genesee County, Michigan.

72.     Defendant Dayne Walling ("Walling") was the elected mayor of the City of Flint during all relevant herein periods.

73.     Walling was at all relevant times herein acting within and outside the scope of his employment and/or authority under color of law.

74.     Walling sued in his individual and official capacity.

75.     Defendant Howard Croft ("Croft") was at all relevant times herein  Flint's Department of Public Works Director acting within and outside the scope of his employment and/or authority under color of law.

76.     Croft is sued in his individual and official capacities.

77.     Defendant Michael Glasgow ("Glasgow") was at all relevant times herein a water treatment plant operator for the City of Flint acting within and outside the

scope of his employment and/or authority under color of law.

78.   Glasgow is sued in his individual and official capacities.

79.   Defendant Daniel Wyant ("Wyant") was at all relevant times herein the Director of MDEQ until Snyder accepted his resignation on or about December 29, 2015.

80.   Wyant was acting within and outside the scope of his employment and/or authority under color of law.

81.   Wyant is sued in his individual capacity.

82.   MDEQ is the State Agency responsible for monitoring water quality.

83.   Defendant Liane Shekter Smith ("Shekter Smith") was at all relevant times herein Chief of the Office of Drinking Water and Municipal Assistance for MDEQ.

84.   At all relevant times Shekter Smith acted within and outside the scope of her employment, and/or authority under color of law.

85.   Shekter Smith is sued in her individual and official capacity.

86.   Shekter Smith was removed from her position on October 19, 2015.

87.   Defendant Stephen Busch ("Busch") was at all relevant times herein the District Supervisor assigned to the Lansing District Office of the MDEQ.

88.   At all relevant times Busch was acting within and outside the scope of his employment and/or authority under color of law.

89.   Busch is sued in his individual and official capacity.

{00019380 1 }

90.     Defendant Patrick Cook ("Cook") was at all relevant times herein Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ.

91.     At all relevant times Cook was acting within and outside the scope of his employment and/or authority under color of law.

92.     Cook is sued in his individual and official capacity.

93.     Defendant Michael Prysby ("Prysby") was at all relevant times herein the MDEQ Engineer assigned to District 11 (Genesee County).

94.     Prysby was acting within and outside the scope of his employment and/or authority.

95.     Prysby is sued in his individual and official capacity.

96.     Defendant Bradley Wurfel ("Wurfel") was at all relevant times herein the Director of Communications for MDEQ.

97.     At all relevant times Wurfel was acting within and outside the scope of his employment and/or authority under color of law.

98.     Wurfel resigned from his position on December 29, 2015.

99.     Wurfel is sued in his individual and official capacity.

100.    Defendant MDHHS is the state agency responsible for public health.

101.    Defendant Eden Wells ("Wells"), was at all relevant times herein Chief Medical Executive within the Population Health and Community Services

Department of the MDHHS.

102.    At all relevant times Wells was acting within and outside the scope of her employment and/or authority under color of law.

103.    Wells is sued in her individual and official capacity.

104.    Defendant Nick Lyon was at all relevant times herein Director of MDHHS.

105.    At all relevant times herein, Lyon was acting within and outside the scope of his employment and/or authority under color of law.

106.    Lyon is sued in his individual capacity.

107.    Defendant Linda Dykema ("Dykema"), was director of the MDHHS Division of Environmental Health.

108.    At all times relevant herein Dykema was acting within and outside her scope of employment and color of authority.

109.    Dykema is sued in her individual and official capacity.

110.    Defendant Nancy Peeler ("Peeler") was at all relevant times herein a MDHHS employee in charge of its childhood lead poisoning prevention program.

111.    At all relevant times herein Peeler was acting within and outside the scope of her employment and/or authority under color of law.

112.    Peller is sued in her individual and official capacity.

113.    Defendant Robert Scott ("Scott") was, at all relevant times herein, Data Manager for MDHHS's Healthy Homes and Lead Prevention Program.

114.    At all relevant times herein Scott was acting within and outside the scope of his employment and/or authority under color of law.

115.    Scott is sued in his individual and official capacity.

116.    Susan Hedman, former EPA Region 5 Administrator, cannot yet be named as a Defendant pursuant to the Federal Tort Claims Act ("FTCA"). Plaintiffs note that if their FTCA claims to the EPA are rejected, they may seek to amend their complaint in order to add claims against Ms. Hedman.

117.    Defendant Veolia North America, Inc. is a Delaware corporation with its principal place of business in Illinois.

118.    Defendant Veolia North America LLC., is a Delaware limited liability company with its principal place of business in Illinois.

119.    Defendant Veolia North America Operating Services LLC., is a Delaware is a limited liability company with its principal place of business in Indiana.

120.    Defendant Veolia Environnement S.A., is a French transnational company with its principal place of business in Paris, France.

121.    All the United States Veolia entities are wholly owned subsidiaries of Veolia Environnement S.A. ("Veolia").

122.    Veolia, at all relevant times herein based on testing, examinations, finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendered its professional expert opinion as to the safety of the continued

use of and confirmed safe continuous use of untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

123.    Veolia maintains an office in the city of Westland, Wayne County, Michigan, transacts business in the State of Michigan, including the business it performed for the City of Flint in 2015, and has committed a tort in the State of Michigan, among bases for personal jurisdiction under MCL 600.705. Each of these bases extends to this District specifically.

124.    Defendant Rowe f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan Corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

125.    Rowe at all relevant times herein based on its testing, examinations finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendering its professional expert opinion as to the safety of the continued use and confirmed safe continuous use of untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

126.    Rowe maintains an office in Flint, Genesee County, Michigan; regularly conducts business in Flint, Michigan; and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

{00019380 1 }

127.    Defendant Lockwood, Andrews, Newnam, Inc. and Lockwood, Andrews, Newnam, P.C. ("LAN"),  is a wholly owned subsidiary of Leo A Daly ("Daly").

128.    LAN, Inc., is a Texas corporation with its principal place of business in Texas.

129.    LAN, P.C., is a Michigan corporation with its principal place of business in Michigan..

130.    Daly is a Nebraska corporation.

131.    LAN, at all relevant times herein based on its testing, examinations, finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendering  its professional expert opinion as to the continued use of and confirmed safe continuous use of  untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

132.    LAN maintains an office in Flint, Genesee County, Michigan, regularly conducts business in the Eastern District of Michigan, and has committed a tort in the State of Michigan, among bases for personal jurisdiction under MCL 600.705, and each of these bases extends to this District specifically.

## JURISDICTION AND VENUE

133.    This Court has jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims pursuant

to 28 U.S.C. § 1331, 18 U.S.C. 1962 (c) and (d) as those claims arise under the Constitution and laws of the United States and the 14th Amendment of the Constitution of the United States.

134.     This Court has jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

135.     This Case does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction.

136.     There are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983, claims pursuant to 28 U.S.C. § 1331, 18 U.S.C. 1962 (c) and (d) and those claims arise under the Constitution and laws of the United States and the 14th Amendment of the Constitution of the United States.

137.     All Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c).

138.     This Court has personal jurisdiction over all individual Defendants because a Michigan Court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

139.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b) (1) and

(2).

## STATEMENT OF FACTS

140.  This case arises from the catastrophic preventable failures, reckless representations and continued misrepresentations of the all the defendants including the EPA,  that all time applicable herein, the water from the Flint River was safe,  with a depraved indifference to the health, safety, and welfare of the citizens of Flint, resulting in personal injury to infant children and adults when attempting to solve the municipal budget crisis with an Emergency Fiscal Plan to balance the budget of Flint.

141.  This case arises from the catastrophic preventable failures, reckless representations and continued misrepresentations of the all the defendants including the EPA,  that at all times applicable herein the water from the Flint River was safe, diminishing the value of the property and businesses of the citizens of Flint, when attempting to solve the municipal budget crisis with an Emergency Fiscal Plan to balance the budget of Flint.

142.  The concerted actions of the defendants herein has undermined all levels of trust in the Michigan government at the Federal, State and local levels.

143.  The actions of Snyder, Dillon, Clinton, Muchmore, MDEQ and MDHHS and their employees,  the Emergency Managers, city of Flint employees, by forcing

them to sell unsafe water at price gouging rates, and then deliberately misrepresenting that this water was safe, caused Michigan's seventh largest city to suffer a catastrophe one might expect to see in a third world country.

144.    Rowe, LAN, and Veolia contributed to this disaster when they negligently and recklessly undertook to provide and rendered paid professional expert services regarding the feasibility and safety and continued safety of the Flint's water system and the connection to the Flint River, which resulted in thousands of exposures and re-exposures to lead and other contaminants and other poisons and substantial property damage in the City of Flint.

145.    A number of heroic outside experts collectively forced the Defendants to acknowledge their mistakes.

146.    Without these outside experts the unmitigated poisoning of Flint's residents would have continued indefinitely.

147.    The intentional Rico Emergency Fiscal Scheme to balance the budget of Flint at any cost including the depraved indifference to the property and businesses of the citizens of Flint with depraved indifference to the structural integrity of the infrastructure began when Snyder,Dillon and Clinton replaced and subsumed the elected Flint leadership with Emergency Managers.

## **The State of Michigan Completely Overtook and Replaced Flint's Representative City Government and Divested the Citizens of Flint of Due Process and Equal Protection**

148.  Since 1988, the State of Michigan has had some form of emergency management law for municipal financial crises.

149.  Under Snyder's business-like approach to government, Michigan's emergency management regime has been aggressively strengthened and deployed.

150.  In 2011, Governor Snyder signed Public Act 4 of 2011 ("PA 4") into law, strengthening the power provided to Emergency Financial Managers and changing their title to "Emergency Managers."

151.  PA 4 allowed the State of Michigan to appoint an Emergency Manager to functionally replace the entirety of a municipal government where the state found a "Financial Emergency."

152.  PA 4 was temporarily suspended after more than 200,000 signatures were collected in an effort to conduct a statewide referendum.

153.  PA 4 was taken off of the books after the statewide referendum decided in favor of repealing it.

154.  PA 4 was quickly replaced when Snyder signed Public Act 436 of 2012 ("PA 436") into law.

155.  PA 436 provides local governments with a "choice" as to whether an Emergency Manager will be appointed.

156.    The local government may "choose" between a consent agreement, chapter 9 bankruptcy, mediation, or an Emergency Manager with similar broad powers Emergency Managers were given under PA 4, which was repealed.

157.    PA 436 forced Emergency Managers on the local government of Flint under the illusion of Flint's ability to determine their own governance. PA 436 is to "preserve the capacity of local units of government… to provide or cause to be provided necessary services essential to public health, safety, property and welfare[.]"

158.    PA 436 specifies that "[u]pon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Emergency Manager Statute and MCL 141.1549(2).

159.    The Emergency Manager's mandate is to "assure . . . the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." Emergency Manager Statute and MCL 141.1549(2).

160.    A PA 436 Emergency Manager "serve[s] at the pleasure of the governor." MCL 141.1549(3) (d).

161.    At all times between December, 2011 and April 30, 2015, the City of Flint was under the control and authority of an Emergency Manager appointed by, and

reported to Snyder, Dillon and Clinton.

162.    Michael Brown served Governor Snyder and Treasurer Dillon as Flint's Emergency Manager from December of 2011, until August of 2012.

163.    Ed Kurtz served Governor Snyder and Treasurer Dillon as Flint's Emergency Manager from August of 2012, until July of 2013.

164.    Michael Brown again served Governor Snyder and Treasurer Dillon as Flint's Emergency Manager from July of 2013, until October of 2013.

165.    Darnell Earley served Governor Snyder,  Dillon and Clinton as Flint's Emergency Manager from October of 2013, until January of 2015.

166.    Gerald Ambrose served Governor Snyder, and Clinton  as Flint's Emergency Manager from January of 2015, until April 30, 2015.

167.    Therefore, at all relevant times prior to April 30, 2015, Flint's local government was subsumed and under the complete control of the State of Michigan.

168.    At all relevant times, all financial decision making and fiscal policy for the City of Flint was made by Flint's Emergency Manager, who acted on behalf of, and with approval of, Snyder, Dillon, Clinton and the state of Michigan.

169.    Any powers of government held by the City of Flint were entirely illusory.

170.    The policy of Snyder, Dillon, Clinton, and the State in implementing Emergency Managers ensured that the public welfare, public services, public safety, public property, public health and other important government functions

were subsumed to financial decisions made by unelected officials.

171.    Through the appointment of an Emergency Manager, Snyder, Dillon, and Clinton turned a municipal fiscal problem in Flint into a humanitarian crisis through the coordinated and systematic effort of all of the Defendants.

172.    At the mid-point of the Fiscal Year 2012 ("FY12") the Flint budget was significantly out of balance.

173.    During the fiscal years of 2014 and 2015, Flint's budget was under the control of the Emergency Manager acting on behalf of, and with the approval of, Snyder, Clinton, Dillon, and the State of Michigan.

174.    By June 30, 2015, the original financial deficit that existed as of FY 2013 of $12.9 million was eliminated and a positive fund balance in the amount of $3.3 million existed.

175.    The positive budget surplus achieved by the City of Flint was accomplished by the Emergency Managers' Emergency Fiscal Plan, with a depraved indifference for the health, safety, and welfare of the predominately non-white citizens of Flint.

176.    Indeed the Emergency Managers disregarded their mandates to protect the public health, safety and welfare under the Emergency Manager statute, and employed unsavory tactics including racial discrimination, price gouging and a switch to a known dangerous, unsafe water source.

177.    In 2010, the EPA commissioned a report that indicated problems with the

MDEQ's ability to ensure safe drinking water.

178. The report indicated a number of technical shortcomings with the way the MDEQ regulated the state's drinking water, particularly as it related to lead contamination.

179. Specifically, the report noted that while federal regulations require water utilities to certify that the drinking water of 90% of homes in a given community contain no more than 15 parts per billion ("ppb") of lead, MDEQ had a practice of not even calculating "90th percentiles" unless a potential exceedance had been identified. This "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated."

180. The report also noted that MDEQ did not conduct the required number of water samples for lead.

181. Those failures were compounded when Snyder, Dillon, Clinton, and the state of Michigan approved the Emergency Manager's decision to switch to and bill for the free Flint River in a scheme to balance the Flint budget while failing to implement proper safeguards prior to distributing and selling this water to Flint's residents.

182. The EPA is responsible for setting and enforcing rules.

183. Enforcement and implementation of those rules is delegated to the state environmental agency, MDEQ.

184.   The EPA's Lead and Copper Rule ("LCR") has been enacted to establish protocols to ensure that public water systems do not allow unsafe levels of lead or copper to contaminate their infrastructure.

185.   While failing to protect the residents of Flint, the MDEQ knowingly violated both the letter and spirit of the LCR, allowing corrosive water to destabilize the metallurgically intact Flint water delivery infrastructure and release the elements of lead and iron into the Flint system.

186.   Specifically, the MDEQ violated the LCR in at least the following ways:

  **a.**   By failing to require corrosion control for Flint River water from the time Flint began drawing it;

  **b.**   By misinforming the EPA about whether corrosion control was being utilized; and

  **c.**   By improperly conducting sampling.

187.   The MDEQ, through its former director Wyant, and employees has explicitly admitted that it did not follow the LCR.

188.   Instead, MDEQ through their employees named as defendants herein, engaged in a pattern of repeated misrepresentations, and deceptions of federal and state law that existed to ensure established water quality standards were adhered to which were relied on by the citizens of Flint.

## The Decision to Switch to the Unsafe Flint River

189.    For approximately 50 years prior to April 25, 2014, the City of Flint paid for and received safe, clean, treated drinking water from the DWSD.

190.    If the Flint River had been a safe and viable primary water source, Flint would have used it prior to April 25, 2014, and would never have paid millions of dollars for water from DWSD.

191.    In Februaryof 2012, Emergency Manager Brown wrote to KWA suggesting that Flint join the yet-to-be-operational KWA due to cost savings over DWSD.

192.    In November of 2012, Emergency Manager Kurtz wrote to Treasurer Dillon suggesting that Flint join the KWA due to cost savings over DWSD.

193.    In April, 2013, Dillon and Snyder gave Emergency Manager Kurtz permission to notify the DWSD that it would be terminating service and would be contracting with and switching to the KWA in the coming years.

194.    At the time this decision was made, it was known by Snyder, Dillon, and Emergency Manager Kurtz that the KWA water supply would not be available for at least 2 ½ years or  until late 2016 and therefore a significant time gap existed between the termination of DWSD and the connection to KWA.

195.    While waiting for the KWA to come online, during this known 2 ½ year time gap, the Emergency Manager, Snyder, Dillon, and Clinton ordered that instead of temporarily remaining a water purchaser from DWSD, the City of Flint would switch to becoming for profit water purveyors of the unsafe but free Flint River.

{00019380 1 }

196.    This allowed the State to bill for unsafe water, through the City of Flint, in furtherance of their fiscal scheme, with no say whatsoever on the part of Flint residents, in order to balance the Flint fiscal budget with a depraved indifference to the structural integrity of the infrastructure, and with no safeguards to protect them under the mandate of the Emergency Manager statute to maintain the public health, safety, and welfare of the non-white citizens of Flint.

197.    The Flint River was studied for use as a primary water source in a 2011 Rowe feasibility study at the request of the government defendants named herein.

198.    At that time, the River was rejected because the costs to prepare Flint's water treatment plant to treat Flint River water to bring it to applicable safety standards were estimated to be in the tens of millions of dollars.

199.    Moreover, the Flint River was unsuitable for use without significant improvements that were cited as necessary prior to use of the Flint River in Rowe's feasibility study.

200.    It was known by the defendants that to safely use the Flint River as a primary water source, the only option was to make costly upgrades to Flint's water treatment plant.

201.    On January 23, 2013, Prysby e-mails colleague Shekter Smith and others about feasibility of Flint switching to the Flint River, highlighting water quality concerns.

202.   On March 26, 2013, Busch e-mails Wyant with Shekter Smith and other MDEQ staff copied, with warnings about public health risks associated with Flint River water.

203.   On November 7, 2013, Rowe was re-hired by Flint's Emergency Manager for professional services for the 2014 fiscal year, where  Rowe would serve as Acting City Engineer.

204.   On March 7, 2014, Emergency Manager Earley sent a letter to the DWSD stating "[w]e expect that the Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination.  In that case, there will be no need for Flint to continue purchasing water to serve its residents and businesses after April 17, 2014."

205.   The only thing that defendant Earley knew and cared about was whether Flint's connection to the Flint River would occur as planned in furtherance of his, Snyder, Dillon, Clinton, and state of Michigan's,  racist and price gouging revenue profiteering scheme.

206.   Emergency Manager Earley, Snyder,  Dillon, and  Clinton knew that  Flint water treatment plant had not made the required multimillion dollar upgrades and was not ready to switch to and send through the Flint water delivery infrastructure, and was not safe and potable, but Earley nevertheless forced the transition through in order to meet an aggressive timeline to begin profiteering and price gouging

billing immediately for free Flint River water.

207.    Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that he was "expecting changes to our Water Quality Monitoring parameters, and possibly our Disinfection Byproduct monitoring on lead & copper monitoring plan… Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible… I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water."

208.    The next day, Glasgow wrote to MDEQ, including Prysby and Busch, noting that he "assumed there would be dramatic changes to our monitoring. I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

209.    On March 26, 2014, Busch e-mails Shekter Smith and Richard Benzie/MDEQ on clarifying what Flint will be required to do before beginning full-

time Flint water treatment plant operation.

210.    The rushed nature of the transition to Flint River water is also evident by a request made by Earley's assistant to the treasurer for a contract to be expedited in order to meet the "aggressive timeline" of the switch.

211.    On March 26, 2014,  Busch e-mailed  Shekter Smith and another colleague the following: "One of the things we didn't get to today that I would like to make sure everyone is on the same page on is what Flint will be required to do in order to start using their plant full time. Because the plant is setup for emergency use, they could startup at any time, but starting up for continuous operation will carry significant changes in regulatory requirements so there is a very gray area as to what we consider for startup."

212.    An April 23, 2014 e-mail from Busch to Wurfel developed talking points for an upcoming Flint meeting that was scheduled to address the Flint River connection. Among the points made, Busch offered: "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

213.    On April 25, 2014, Flint officially began purveying and using the Flint River as its primary water source, despite the fact that it was known  that no proper

preparations had been made.

214.  The same day, Flint Mayor Dayne Walling publicly declared "It's regular, good, pure drinking water, and it's right in our backyard."

215.  Flint Department of Public Works, Director, Howard Croft also stated in a press release that "The test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect. We are proud of that end result."

216.  This transition put Flint in the business of water purveying and revenue collecting from the Flint River, a free water source.

217.  LAN was hired to prepare Flint's water treatment plant for the treatment of water sources, from both the Flint River, and later, the KWA.

218.  Flint's water treatment plant had not needed to treat the water received from DWSD, but only needed to distribute the DWSD water through the Flint water treatment infrastructure, because the DWSD provided the water in an already treated state.

219.  LAN was hired to provide professional expert services to make Flint's water treatment plant sufficient to treat water from the known unsafe Flint River and, roughly 2 ½ years later, from the KWA.

220.  Both LAN and Rowe failed in this task.

221.  Their actions further facilitated the reckless connection to the unsafe Flint

River, without the proper treatment needed, and without the tens of millions of dollars of upgrades to the Flint water treatment plant, nor corrosion control, which Defendants knew or should have known was required to safely sell and distribute Flint River water to Flint's residents.

222. An important consideration any time a water system changes sources is to account for differences in those sources.

223. According to the EPA, "it is critical that public water systems, in conjunction with their primary agencies and, if necessary, retain outside technical consultants, to evaluate and address potential impacts resulting from treatment and/or source water changes."

224. In Rowe's 2011 feasibility report, Rowe emphasized the need for treatment to the Flint River water and for improvements to Flint's water treatment plant in the event that the river was to be used as a primary source.

225. LAN submitted a proposal to the city of Flint for " Flint Water Treatment Rehabilitation Phase II (LAN's 2013 Proposal).  The proposal is to make " improvements…intended to help the city operate the plant on a full time basis using the Flint River." The proposal is signed by J. Warren Green, Professional Engineer ( Project Director ), and Samir F. Matta, Professional Engineer ( Senior Project Manager ).

226. The State of Michigan (on its own or through its control of the City of Flint),

the MDEQ, the Emergency Manager, Rowe, LAN and Veolia disregarded their own findings regarding necessary water treatment, and necessary water distribution plant upgrades.

227. Furthermore, these defendants acted with depraved indifference by allowing Flint River water to be sent through the Flint water delivery infrastructure without corrosion control treatment that was required to safely maintain the metallurgical structural integrity of the Flint infrastructure to protect the public health, safety, welfare and property.

228. MDEQ, LAN, Rowe and Veolia were responsible for ensuring that Flint set water quality standards and properly treated its water.

229. Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources.

230. Flint River water is known to contain many times more chloride than DSDW water.

231. It is well known that corrosive water that is not properly treated results in the corrosion of metallurgically stable pipes, such that the metals in the pipes destabilize and leach into the system and infrastructure.

232. Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the system.

233. At the time of the switch to Flint River water, no phosphates were being

added to the system.

234.  Nothing was being done to prevent the corrosive Flint River water to enter the infrastructure and to the taps of the citizens of the city of Flint, despite prior knowledge of the dangers of doing so, possessed by MDEQ, the Flint water treatment plant personnel, LAN, Rowe, and Veolia.

235.  As a result of the failure to properly treat the Flint River, corrosive water was delivered into and throughout the Flint water delivery infrastructure.

236.  As all Defendants were aware, the corrosive water predictably corroded and metallurgically destabilized the heretofore stable metal pipes of the Flint water delivery infrastructure, causing the elements of lead and iron to be leached from and released into the system.

237.  The corrosive nature of the water was immediately apparent.

238.  Soon after the switch to the Flint River, the residents of Flint began complaining about discolored water—clearly indicating that iron and lead were in the system.

239.  This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead.

240.  An estimated 15,000 of Flint's 30,000 residential service lines are composed of lead.

241.  The exact number is presently unknown given the city of Flint's negligent,

sloppy record keeping and lack of inquiry into this public safety matter.

242. Lead is a powerful neurotoxin with devastating, irreversible impacts on the development of children, in utero fetuses, and also causes injury to adults.

243. There is no safe level of lead as its effects are harmful even at low levels.

244. Lead exposure in children and heightened levels of lead in the blood and body, result in problems including but not limited to decreased IQ, behavioral problems, irreversible brain damage, hearing impairment, attention deficit disorder, learning disabilities, need for lifetime medical treatment and monitoring, loss of earnings, impaired balance and nerve function, infections, skin problems, digestive problems, and psychological disorders.

245. Lead also causes serious health effects in adults, including digestive, cardiovascular, and reproductive problems, kidney damage, dizziness, fatigue, weakness, depression and mood disorders, diminished cognitive performance, nervousness, irritability, and lethargy.

246. Lead contamination is not the only problem that is caused when corrosive water is distributed into a public water system.

247. When water corrodes iron pipes, the iron leaching into the water system can consume the chlorine therein, which is necessary to prevent the growth of microorganisms that can cause disease.

248. With chlorine consumed by iron, the risk of infection by organisms such as

legionella increases.

249.    Corrosion of iron water pipes is obvious when it occurs, as the water appears discolored.

250.    The corrosion of iron pipes can also result in an increase in water main leaks and breaks.

251.    The signs of iron corrosion are a warning sign that lead corrosion may also be present, since both are caused by the same phenomenon.

252.    Almost immediately after the water source was approved and connected to the Flint River, signs of trouble with Flint's water quality began to surface.

253.    Within weeks, many residents began to complain about odorous, discolored water.

254.    As complaints rolled in, Mayor Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."

255.    In August and September, 2014, the City of Flint issued two boil water advisories after fecal coliform bacteria was discovered in the water.

256.    On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

257.    Discussing General Motors' decision, Prysby wrote to Busch, Shekter Smith

and others that the Flint River water had elevated chloride levels. He stated that "although not optimal" the water was "satisfactory."

258.    Prysby noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

259.    On October 14, 2014, Valerie Brader, State Deputy Legal Counsel and Senior Policy Advisor, emails Muchmore and other top aides arguing for a return to DWSD because of water quality problems. Michael Gadola, then the Governor's Legal Counsel, responds by agreeing with Brader. Brader and Rich Baird, another senior aide to the Governor, then discuss the idea with Emergency Manager Darnell Earley, who maintains the water quality problems can be solved and it would be cost-prohibitive to return to DWSD.

260.    In October of 2014, Muchmore briefed Snyder and blamed iron pipes, susceptible to corrosion and bacteria, for the two boil water advisories.

261.    On November 26, 2014, LAN issued a 20-page Operation Evaluation Report intended to address the Flint River water's compliance with EPA and MDEQ operations and regulations.

262.     The LAN report entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes.

263.    On January 2, 2015, the City of Flint mailed a notice to its water customers

indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water.

264.   It was claimed that the water was safe to drink for most people with healthy immune systems.

265.   On January 9, 2015, the University of Michigan – Flint discovered lead in campus drinking fountains.

266.   With the water quality's problems now obvious, on January 12, 2015, DWSD offered to waive a 4 million dollar reconnection fee to allow the City of Flint to transition back to purchasing  the safe DWSD water  which Flint had been purchasing for roughly 50 years.

267.   Ambrose declined the offer.

268.   On January 21, 2015, enraged Flint residents attended a meeting at Flint City Hall, bringing jugs of discolored water and complaining about the water's smell and taste.

269.   As early as January of 2015, the State of Michigan secretly provided purified water coolers to the Flint State offices, in response to concerns by the state employees working therein, about the Flint River  drinking water, while state employees continued to tell the public that the Flint River water was safe to drink.

270.   On January 29, 2015, in an e-mail to MDEQ deputy director Jim Sygo, Shekter Smith made statements indicating her knowledge of the Flint River's

corrosivity. "I'm theorizing here, but most likely what they are seeing is a result of differing water chemistry. A change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system. This may continue for a while until things stabilize. It would be unusual for water leaving the plant to have color like people are seeing at their taps. Generally this is a distribution system problem or a premise plumbing issues. Since it appears wide-spread, it's most likely a distribution system problem."

271.    On February 6, 2015, an Emergency Manager staff member wrote to Prysby, described as the MDEQ's "most knowledgeable staff member on the Flint and Genesee County water supply issues," asking whether Prysby knew whether the MDEQ had ever conducted a "source water assessment" for the Flint River.

272.    After an initial response stating that he did not know, Prysby later responded that a study on the Flint River as an emergency intake had been conducted in 2004.

273.    The 2004 study noted that the Flint River was a highly sensitive drinking water source that was susceptible to contamination, yet apparently Prysby ignored the 2004 study, or recklessly and willfully closed his eyes to its findings, so that the Flint River could be approved for use as a water source.

274.    On March 3, 2015, Ambrose sent a memorandum to the Michigan Department of Treasury claiming that reconnecting to DWSD would cost at least

ten (10) million dollars per year, with bills as high as one (1) million dollars per month.

275.    Ambrose stated that "[i]f $12 million annually were available for discretionary use, it would be far better spent reducing rates (which were the highest in the nation) paid by Flint customers and/or modernizing the City's system."

276.    According to Ambrose  "[t]he oft-repeated suggestion that the City should return to DWSD, even for a short period of time, would, in my judgment, have extremely negative financial consequences to the water system."

277.    On March 10, 2015, a Genesee County Health Department employee named James Henry wrote the following scathing message to Croft,  Prysby,  and others:

> "The Genesee County Health Department has made several written and verbal requests for specific information since October 2014, including a Freedom of Information Act request on January 27, 2015. The information still has not been received and the city's lack of cooperation continues to prevent my office from performing our responsibilities. The Genesee County Health Department has the responsibility to conduct illness investigation and consider all potential sources, this is not optional. In 2014, Genesee County experienced a significant increase of confirmed Legionella illnesses relative to previous years. Legionella can be a deadly, waterborne disease that typically affects the respiratory system. The increase in illnesses closely corresponds with the timeframe of the switch to Flint River water. The majority of the cases reside or have an association with the city. Also, McLaren Hospital identified and mitigated Legionella in their water. This is rather glaring information and it needs to be looked into now, prior to the warmer summer months when Legionella is at its peak and we are potentially faced with a crisis. This situation has been explicitly explained to MDEQ and many of the city's officials. I want to make sure, in writing that there are no misunderstandings regarding this significant and urgent public health issues.  The Trihalomethane issues

'pale in comparison' to the potential public health risks of Legionella…. In the past, I have requested to meet with the water plant staff and MDEQ regarding Legionella concerns. I did not receive a response from the water plant staff and MDEQ declined. I think it is in the best interest for all stakeholders that we meet and discuss the issues."

278.    On February 26, 2015, Initial EPA-MDEQ correspondence regarding elevated lead in sample collected from LeeAnne Walters's house. Jennifer Crooks/EPA speculates Flint River water chemistry is leaching contaminants from pipes; this prompts the EPA's initial query of MDEQ about whether optimized corrosion control treatment (OCCT) is in place at the Flint WTP.

279.    On February 27, 2015, in response to concerns about extremely high levels of lead in a resident's water sample, Busch misrepresented to the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program in place.

280.    Busch made the above statement to the EPA with actual knowledge that it was a misrepresentation and that no corrosion controls had been implemented.

281.    Defendant employees of MDEQ were required to know whether Flint had an optimized corrosion control program, because ensuring the existence of that program was the express responsibility of MDEQ.

282.    Defendant employees of MDEQ did in fact know that no optimized corrosion control had been implemented, since MDEQ was involved in the decision not to implement corrosion control.

283.    Also on February 27, 2015, the EPA's regional drinking water regulations manager Miguel Del Toral began to voice his concerns about the likely cause of the high lead levels detected in Flint in an email to Defendant Prysby.

284.    Del Toral attributed those levels to particulate lead, which would mean that the MDEQ's testing methods of "pre-flushing" water from homes would bias samples low. He also inquired about optimized corrosion control, which he noted was required in this instance.

285.    At another point in February, 2015, Snyder received a briefing on Flint's water problems from MDEQ director Wyant, which included resident complaints about discolored, low quality tap water and a letter from a state representative indicating that his constituents were "on the verge of civil unrest."

286.    Snyder did not take any action in response to the residents' direct pleas to him to address the unsafe water conditions in Flint.

287.    Around the same time, MDEQ e-mails explained away "hiccups" in the transition to Flint's water system, discounted the possibility of imminent threats to public health, and noted that the switch to the Flint River "put the city in the business of water production, where they had historically been in the business of water transmission." It was claimed that "once the city connects to the new KWA system in 2016, this issue will fade into the rearview."

288.    The e-mail also noted that "MDEQ approved the use of river as a source[.]"

289.    Had the MDEQ properly studied the river and set water quality standards, it would have known what a disastrous idea this was.

290.    In early 2015, Veolia was hired to conduct a review of the city's water quality, largely in response to citizen complaints.

291.    Veolia declared the water safe while the water poisoned tens of thousands of Flint residents and continuously damaged and weakened the structural integrity of the Flint water delivery infrastructure.

292.    Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken.

293.    As water treatment professionals, Veolia had an opportunity to catch what co-Defendant LAN and Rowe had missed or refused to warn about—that corrosive untreated water was being pumped throughout the Flint water delivery infrastructure and was destabilizing the metallugically intact pipes, stripping and releasing and the elements of lead and iron to be  released in taps into the homes and businesses of Flint residents and throughout the infrastructure.

294.    On January 29, 2015 Veolia, acting as Veolia Water North America Operating Services, LLC, through Mr. David Gadis, its Senior Vice President, Sales, Municipal and Commercial Development, submitted to the City of Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No.: 15-573 (Veolia's 2015 Bid4). Veolia proposes, "to address the immediate reliability

and operational needs" of the City's water system.

295.   On the 10th of February 2015, the City of Flint announced publicly that it would retain Veolia's water experts. Veolia Vice President David Gadis states: "We are honored to support your community with our technical expertise so that together we can ensure  water  quality for the people of the city of Flint." Mr. Gadis further states that Veolia has "extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water."

296.   On 12 February 2015 Veolia's Vice President Rob Nicholas states: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

297.   Veolia issued an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. ·

298.   In its interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing."

299.   In other words, Veolia publicly misrepresented that Flint's unsafe water was safe.

300.    Veolia's interim report also noted that the discoloration in Flint's water

"raises questions," but "[d]oesn't mean the water is unsafe."

301.    The interim report noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

302.    In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water. "

303.     Veolia issued its final "Water Quality Report" dated March 12, 2015.

304.    In the final report, Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget."

305.    The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

306.    The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

307.    Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

308.    Therefore, in addition to failing to disclose the possible connection between the lack of corrosion control and both lead and iron leaching from the Flint water delivery infrastructure into the water,  the resulting lead and iron contamination, as well as the ongoing and cumulative corrosion and weakening of the Flint water delivery infrastructure, Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

309.    As a result of Veolia's depraved indifference, the residents of the city of Flint continued to be exposed to toxic lead throughout 2015 and continuing into 2016 without being warned of the dangers to public health, safety, welfare and property.

310.    As evidence of problems mounted, Snyder, Dillon, Clinton, the state of

Michigan, MDEQ and its employees, MDHHS and its employees, Emergency Managers, City of Flint and its employees LAN, Rowe, and Veolia, repeatedly denied the dangers facing Flint's residents, insisting that their water was safe to drink, despite having knowledge and evidence to the contrary.

311. On March 23, 2015, Flint's powerless City Council voted 7-1 to end Flint River service and return to DWSD.

312. EM Ambrose declared that vote "incomprehensible" and rejected the City Council proposal to end the sale and use of the Flint River as a water source.

313. EM Ambrose then publicly misrepresented that "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality… water from Detroit is no safer than water from Flint."

314. On April 24, 2015, the MDEQ finally admitted to the EPA that Flint did not have optimized corrosion control in place, thereby disclosing its prior misrepresentation from two months prior.

315. The flawed interpretation used by MDEQ and its Defendants employees amounted to another one year "free pass", where the Flint River served as a free water source that generated significant revenue for Flint to balance the City budget, while it continued damaging the structural integrity of its infrastructure and damaging the health, safety and welfare of the predominately non-white city of

Flint residents.

316.    Shekter, Cook, Busch, and Prysby were expressly told by Mr. Del Toral that their sampling procedures skewed lead level results and did not properly account for the presence of lead in service lines.

317.    In April of 2015, Mr. Del Toral issued a memorandum to the MDEQ, stating: "I wanted to follow up on this because Flint has essentially not been using any corrosion control treatment since April 30, 2014, and they have (lead service lines). Given the very high lead levels found at one home and the pre-flushing happening in Flint, I'm worried that the whole town may have much higher lead levels than the compliance results indicated, since they are using pre-flushing ahead of their compliance sampling."

318.    On April 27, 2015, Miguel Del Tora I/EPA e-mails Tom Poy/EPA and other colleagues stating that Pat Cook/MDEQ has confirmed the Flint WTP has no corrosion control treatment (CCT), which is "very concerning given the likelihood of lead service lines in the city."

319.    Del Toral, EPA employee, and a national expert in the field, identified the problem, the cause of that problem, and the specific reason which the MDEQ, Rowe, LAN, and Veolia, each had failed to disclose.

320.    The MDEQ ignored and dismissed his findings.

321.    The MDEQ's director, Wyant, was expressly aware of Del Toral's comments

and concerns.

322.   On May 1, 2015, Cook sent an e-mail to Mr. Del Toral disagreeing with Del Toral's interpretation of his own agency's rules and vehemently resisting calls for a water quality study.

323.   Cook noted that "[a]s Flint will be switching raw water sources in just over one year from now, raw water quality will be completely different than what they currently use. Requiring a study at the current time will be of little to no value in the long term control of these chronic contaminants."

324.   Cook, the MDEQ and all other Defendants named herein, believed they could simply run out the 2 ½ year clock on Flint's water quality problem, despite its risks to public health, until the KWA water system neared completion.

325.   Cook also claimed and misrepresented that "the City of Flint's sampling protocols for lead and copper monitoring comply with all current state and federal requirements. Any required modifications will be implemented at a time when such future regulatory requirements take effect."

326.   On June 24, 2015, Mr. Del Toral authored an alarming memorandum more fully stating his concerns about the problems with MDEQ's oversight of Flint.

327.   The memorandum noted that the city was not providing corrosion control for mitigating lead and copper levels, "[a] major concern from a public health standpoint."

328.  Further, "[r]ecent drinking water sample results indicate the presence of high lead results in the drinking water, which is to be expected in a public water system that is not providing corrosion control treatment. The lack of any mitigating treatment for lead is of serious concern for residents that live in homes with lead service lines or partial lead service lines, which are common throughout the City of Flint."

329.  Additionally, "[t]he lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in the City of Flint's compliance samples due to the sampling procedures used by the City of Flint for collecting compliance samples… . This is a serious concern as the compliance sampling results which are reported by the City of Flint to residents could provide a false sense of security to the residents of Flint regarding lead levels in their water and may result in residents not taking necessary precautions to protect their families from lead in the drinking water . . . [o]ur concern . . .  has been raised with the [MDEQ]."

330.  Del Toral's memorandum also noted that a Flint resident, Ms. Lee-Anne Walters, who had directly contacted the EPA, had alarming results of 104 ug/L and 397 ug/L[2], especially alarming given the flawed sampling procedures used by the MDEQ.

---

[2] Ug/L is equivalent to parts per million or PPM

331.    The MDEQ had misrepresented to Walters that the lead was coming from the plumbing in her own home, but Del Toral's inspection revealed that her plumbing was entirely plastic.

332.    The memorandum also noted blood tests that showed Ms. Walters's child had elevated blood lead levels, and that additional sample results from resident-requested samples showed high levels of lead.

333.    Among those copied on Mr. Del Toral's memorandum were Liane Shekter-Smith, Pat Cook, Stephen Busch, and Michael Prysby.

334.    On May 11, 2015, Jon Allan, director of the Michigan Office of the Great Lakes, e- mailed  Shekter Smith for her reactions to the following language in a proposed report: "By 2020, 98 percent of population served by community water systems is provided drinking water that meets all health-based standards… By 2020, 90 percent of the non-community water systems provide drinking water that meets all health-based standards."

335.    Responding the same day, MDEQ Water Resources Division Chief William Creal replied: "I think you are nuts if you go with a goal less than 100 percent for (drinking water) compliance in the strategy. How many Flints do you intend to allow???"

336.     Shekter Smith responded the next day: "The balance here is between what is realistic and what is ideal. Of course, everyone wants 100 percent compliance.

The reality, however, is that it's impossible. It's not that we 'allow' a Flint to occur; circumstances happen. Water mains break, systems lose pressure, bacteria gets into the system, regulations change and systems that were in compliance no longer are, etc. Do we want to put a goal in black and white that cannot be met but sounds good? Or do we want to establish a goal that challenges us but can actually be accomplished? Perhaps there's a middle ground?"

337.　In July of 2015, Busch claimed that "almost all" homes in the pool sampled for lead in Flint had lead service lines. This was patently untrue and was made with no basis in fact, and the effect of this mistake made the lead testing results even more unreliable. Busch knew that it was not true, because Flint's records were insufficient to allow him to make such a determination.

338.　On July 9, ACLU-Michigan reporter Curt Guyette publicly broke the story about lead in Flint's drinking water, citing Del Toral's memorandum and exposing the lack of corrosion control in Flint's water.

339.　Four days later, Wurfel issued the following false public statement: "Let me start here- anyone who is concerned about lead in the drinking water in Flint can relax."

340.　On July 21, 2015, the EPA and MDEQ conducted a conference call regarding MDEQ's implementation of the LCR.

341.　EPA pushed for optimized corrosion control (which MDEQ had previously

misrepresented to the EPA that Flint was already using), to which the MDEQ now responded that corrosion control was unnecessary and premature.

342.    MDEQ could not have been more wrong.

343.    Far from being premature, it was already too late to fully protect the predominately non-white people of Flint.

344.    In an e-mail follow-up to that call, sent to an EPA employee, Shekter Smith stated "while we understand your concerns with the overall implementation of the lead and copper rule; we think it is appropriate for EPA to indicate in writing (an email would be sufficient) your concurrence that the city is in compliance with the lead and copper rule as implemented in Michigan… This would help distinguish between our goals to address important public health issues separately from the compliance requirements of the actual rule which we believe have been and continue to be met in the city of Flint."

345.    Shekter Smith's statement indicates that she and the MDEQ were more concerned about proving technical compliance with the LCR than "address[ing] important public health issues."

346.    On July 22, 2015, Governor Snyder's chief of staff, Muchmore, sent an e-mail indicating his awareness of the problems with Flint's water and the state's inadequate response. He noted: "I'm frustrated by the water issue in Flint. I really don't think people are getting the benefit of the doubt. Now they are concerned and

rightfully so about the lead level studies they are receiving from DEQ samples. Can you take a moment out of your impossible schedule to personally take a look at this? These folks are scared and worried about the health impacts and they are basically getting blown off by us (as a state we're just not sympathizing with their plight)."

347.    Linda Dykema, director of the MDHHS Division of Environmental Health sent an email to a number of department employees attempting to discredit Mr. Del Toral, to this point the only government employee actively trying to protect Flint's residents from lead poisoning

348.    She claimed "[r]egarding the EPA drinking water official quoted in the press articles, the report that he issued was a result of his own research and was not reviewed or approved by EPA management. He has essentially acted outside his authority."

349.    On July 24, 2015,  Wurfel wrote an e-mail to Busch, Prysby, Shekter Smith and Wyant, stating: "Guys, the Flint Ministers met with the Governor's office again last week. They also brought along some folks from the community – a college prof and GM engineer – who imparted that 80 water tests in Flint have shown high lead levels. Could use an update on the January/June testing results, as well as recap of the December testing numbers, and any overview you can offer to edify this conversation?"

350. Busch responded the same day in email to Wurfel copied to all others on the original e-mail, claiming that the second round of Flint drinking water testing showed a 90th percentile level of 11 parts per billion, almost double the prior round's results.

351. Even with MDEQ's terribly flawed sampling methods showing that lead levels had nearly doubled since the first six month testing, and even with outside evidence of even higher levels, Defendants showed no concern and took no immediate action to protect the health, safety and welfare of the predominately non-white people of Flint.

352. Busch also noted in his e-mail that Flint would be completing "a study (within 18 months) and are allowed a period of additional time (2 additional years) to install the selected treatment for fully optimized corrosion control."

353. On July 24, 2015, Wurfel wrote the following to recipients including Muchmore and Wyant: "Guys, here's an update and some clarification on the lead situation in Flint. Please limit this information to internal for now…By the tenants of the federal statute, the city is in compliance for lead and copper. That aside, they have not optimized their water treatment… Conceivably, by the time we're halfway through the first timeline, the city will begin using a new water source with KWA… and conceivably, the whole process starts all over again. In terms of near-future issues, the bottom line is that residents of Flint do not need to worry

about lead in their water supply, and DEQ's recent sampling does not indicate an eminent health threat from lead or copper."

354.    In August, 2015, the EPA pressed MDEQ to move faster on implementing corrosion control in Flint.

355.    On August 23, 2015, Virginia Tech Professor Marc Edwards wrote MDEQ to inform them that he would be conducting a study of Flint's water quality.

356.    On August 27, 2015, Professor Edwards's preliminary analysis was released. More than half of the first 48 samples he tested came back above 5 ppb, and more than 30% of them came back over 15 ppb, which would be unacceptable even as a 90th percentile. He called the results "worrisome."

357.    In an e-mail response to a Governor's office inquiry regarding the high lead levels in residents' homes and the discrepancy between those numbers and the state's test results,  Wurfel misrepresented that "[d]on't know what it is, but I know what it's not. The key to lead and copper in drinking water is that it's not the source water, or even the transmission lines (most of which are cast iron). It's in the premise plumbing (people's homes)."

358.    This false statement was made despite the facts that about half of Flint's homes are connected to lead service lines, and that it was clear by this point that Ms. Walters's home had plastic plumbing.

359.    Wurfel then blamed Mr. Del Toral, the ACLU, and others taking action to

help Flint's residents, stating: "This person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals… [I]t's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed."

360.     On August 28, 2015, an EPA employee notified Shekter Smith and other MDEQ employees that "Marc Edwards (Virginia Tech) is working with some of the citizens in Flint and they are finding lead at levels above five parts per billion and some above 15 parts per billion. There's no indication of whether any of these homes were also sampled and analyzed by Flint and will now be part of their compliance calculations. Virginia Tech sent out 300 bottles and have gotten 48 back. We are not involved in this effort by Dr. Edwards."

361.     On September 2, 2015, Wurfel engaged in further efforts to discredit Edwards, this time in a press release. He misrepresented that: "[W]e want to be very clear that the lead levels being detected in Flint drinking water are not coming from the treatment plant or the city's transmission lines… The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes….the results reported so far fail to track with any of the lead sampling conducted by the city. In addition, Virginia Tech results are not reflected by the

blood lead level testing regularly conducted by the state department of community health that have not shown any change since Flint switched sources."

362. On September 6, 2015, Wurfel's continued attempt to discredit Edwards's lead level results was published through Michigan Public Radio: "The samples don't match the testing that we've been doing in the same kind of neighborhoods all over the city for the past year. With these kinds of numbers, we would have expected to be seeing a spike somewhere else in the other lead monitoring that goes on in the community."

363. Had the MDEQ or MDHHS been doing their jobs, they would indeed have seen spikes in all other forms of lead monitoring.

364. MDEQ had been told exactly why its testing failed to reveal extremely high levels of lead.

365. Edwards published a report in early September, 2015, with startling findings. Among them: "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM"; "101 out of 252 water samples from Flint homes had first draw lead more than 5 ppb"; "Flint's 90th percentile lead value is 25 parts per billion… over the EPA allowed level of 15ppb that is applied to high risk homes… How is it possible that Flint 'passed' the official EPA Lead and Copper Rule sampling overseen by MDEQ?"; "Several samples exceeded 100ppb and one sample collected after 45 seconds of flushing exceeded 1,000 ppb[.]"

366.    Additional Edwards's findings included that "[o]n average, Detroit water is 19 times less corrosive than the Flint River water currently in use."

367.    The predominately non-white residents of Flint were used as guinea pigs in a "test then treat" scenario that ensured absolutely no protection from lead contamination, thereby facilitating continued profiteering and price gouging per the Emergency Fiscal Scheme to raise substantial revenue from water sales from free water paid for by Flint residents, with a depraved indifference to the residents' health, safety, and property.

368.    Edwards predicted that "in the weeks and months ahead MDEQ, MDHHS, and Flint will be forced to admit they failed to protect public health as required under the Federal Lead and Copper Rule."

369.    Another Wurfel hit job on Professor Edwards and his team occurred on September 9, 2015, when he falsely told a reporter: "[T]he state DEQ is just as perplexed by Edwards's results as he seems to be by the city's test results, which are done according to state and federal sampling guidelines and analyzed by certified labs."

370.    Wurfel also claimed that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames

irresponsibly."

371.   Wurfel and MDEQ publicly attempted to discredit the people working to protect the public health, by providing false assurances to Flint's residents that  the water was safe, while said water continued to lead poison them.

372.   On September 10, 2015, Dr. Yanna Lambrinidou, a member of the EPA National Drinking Water Advisory Council Lead and Copper Rule workgroup wrote to  Wurfel and Busch, requesting information on "optimal water quality parameter ranges" that MDEQ should have set for Flint's water.

373.   No such information existed, because MDEQ had never created it.

374.   Busch responded "[a]ll previous water quality parameter ranges would have been established for the City of Flint's wholesale finished water supplier, the Detroit  Water  and Sewerage Department, not the City of Flint itself. As the City of Flint has not yet established optimized corrosion control treatment, the MDEQ is not yet at the point of regulatory requirements where the range of water quality parameters would be set."

375.   Water quality parameter ranges ensure safe levels of things like PH, nitrates and phosphates.

376.   Dr. Lambrinidou replied "do you mean that MDEQ never set optimal water quality parameter ranges specifically for Flint before Flint's switch to Flint River water? It is my impression, please correct me if I'm wrong, that under the LCR, all

large systems – whether they are consecutive or not – must have optimal water quality parameter ranges designated by states specifically for them (at the time when these systems are deemed to have optimized their treatment). Is there language in the LCR I am missing that allows a utility not to have optimal quality parameter ranges established specifically for it? My second question is this: If the City of Flint had no optimal water quality parameter ranges established specifically for it in the past, how did it achieve LCR compliance? Isn't it the case that utility-specific optimal water quality parameter ranges (and maintenance of these ranges) are required for all large systems to avoid an LCR violation?"

377.    On September 25, 2015  Busch  responded by reiterating that Flint was not required to implement corrosion control until unacceptably high levels of lead had already appeared in the water.

378.    A September 10, 2015 e-mail from the EPA's Jennifer Crooks to Shekter Smith, summarizing an apparent EPA-MDEQ conference call, acknowledged that Professor Edwards's study "[was] putting added pressure on MDEQ, and EPA to ensure that Flint addresses their lack of optimized corrosion control treatment in an expedited manner in order to protect the residents from exposure to high lead levels." Further, "EPA acknowledged that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water."

379.    In a September 17, 2015 letter,  Wyant wrote a letter in response to an inquiry from various legislators, disavowing any responsibility for reacting to Mr. Del Toral's alarm- sounding memorandum: "With respect to the draft memo referenced in your letter, the MDEQ does not review or receive draft memos from the USEPA, nor would we expect to while it is a draft."

380.    Wyant's statement was made despite the fact that he and the MDEQ were fully aware of Del Toral's memorandum and the concerns it raised, and this apparent MDEQ policy served to  justify ignoring Del Toral while the profiteering from sales of unsafe water to Flint residents continued.

381.    On September 15, 2015, MLive published an article entitled "Virginia Tech professor says Flint's tests for lead in water can't be trusted." Edwards is quoted as recommending a return to DWSD, stating "Flint is the only city in America that I'm aware of that does not have a corrosion control plan in place to stop this kind of problem."

382.    On September 23, 2015, an e-mail from Croft containing misrepresentations and omissions was sent to numerous officials, and included the following: "I am pleased to report that the City of Flint has officially returned to compliance with the Michigan Safe Drinking Water Act and we have received confirming documentation from the DEQ today…Recent testing has raised questions regarding the amount of lead that is being found in the water and I wanted to report to you

our current status. At the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the DEQ. It was determined that having more data was advisable prior to the commitment of a specific optimization method. Most chemicals used in this process are phosphate based and phosphate can be a 'food' for bacteria. We have performed over one hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."

383.    Croft's statement was made with reckless disregard for the truth and the public health, since he knew that the samples the city had taken were insufficient to draw any conclusions from.

384.    Croft's widely disseminated message makes no mention of the flawed lead testing results.

385.    On September 25, 2015, Muchmore sent an e-mail to Governor Snyder and others that treated the situation in Flint as a political inconvenience instead of a humanitarian crisis. He stated: "The DEQ and [MDHHS] feel that some in Flint are taking the very sensitive issue of children's exposure to lead and trying to turn it into a political football claiming the departments are underestimating the impacts on the populations and are particularly trying to shift responsibility to the state…**I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject.** The real responsibility

rests with the County, city, and KWA[.]" (Emphasis added.)

386.    In addition to ignoring the fact that the state had taken over Flint, Muchmore's evasion of state responsibility ignores the role of Snyder, Dillon, Clinton, the Emergency Managers, MDEQ and MDHHS, Rowe, LAN, and Veolia in this crisis.

387.    Where MDEQ caused, obscured, and lied about the lead problem, MDHHS should have disclosed it.

388.    Instead, the MDHHS misrepresented, obfuscated, and intentionally withheld information and data which conclusively showed that there was an uptick in the number of children in Flint who were being exposed and re- exposed to lead.

389.    It took the work of another outside expert, Dr. Mona Hanna-Attisha, to force MDHHS to acknowledge its failures.

390.    Whereas MDEQ ignored and criticized the very people it should have been gratefully listening to in Mr. Del Toral and Dr. Edwards, the MDHHS extended the same treatment to Dr. Mona Hanna-Attisha, a pediatrician at Flint's Hurley Hospital.

391.    In a July 28, 2015, email from MDHHS epidemiologist Cristin Larder to MDHHS employees Nancy Peeler and Patricia McKane, Larder identifies an increase in blood lead levels in Flint just after the switch to river water, and concludes only that the issue "warrant[s] further investigation."

392.    On the same day, Nancy Peeler sent an e-mail admitting an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014, but, without factual basis, misrepresented and attributed it to seasonal variation.

393.    MDHHS took no actions as outsiders began to discover and reveal Flint's lead problem.

394.    Instead, it withheld and obfuscated data and obstructed those researchers while actively attempting to refute their findings.

395.    In a September 10, 2015, e-mail from MDHHS health educator Michelle Bruneau to colleague Kory Groestch, regarding a talking points memorandum, she states: "[M]ay be a good time to float the draft out to the others because if we're going to take action it needs to be soon before the Virginia Tech University folks scandalize us all."

396.    In a September 11, 2015, e-mail to Linda Dykema and Kory Groestch of the MDHHS,  Shekter Smith wrote: "Since we last spoke, there's been an increase in the media regarding lead exposure. Any progress developing a proposal for a lead education campaign? We got a number of legislative inquiries that we are responding to. It would be helpful to have something more to say."

397.    MDHHS's Bruneau responded to Groetsch: "Told ya," and incredibly, includes a "smiley face" emoticon.

398.    Groetsch then responds to Shekter Smith that Bruneau has written only "the

bones" of a health education and outreach plan.

399.    The same day, Robert Scott, the data manager for the MDHHS Healthy Homes and Lead Prevention program, was e-mailed a copy of a grant proposal for Professor Edwards's study. Edwards's grant proposal described a "perfect storm" of "out of control" corrosion of city water pipes leading to "severe chemical/biological health risks for Flint residents." Scott forwarded the grant proposal to MDHHS employees Nancy Peeler, Karen Lishinski, and Wesley Priem, with the note"[w]hen you have a few minutes, you might want to take a look at it. Sounds like there might be more to this than what we learned previously. Yikes!"

400.    On September 22, 2015, MDHHS Environmental Public Health Director and Lynda Dykema, emailed MDHHS' Geralyn and Peeler, among others. She stated: "Here is a link to the VA Tech study re city of Flint drinking water… It appears that the researchers have completed testing of a lot of water samples and the results are significantly different than the city and DEQ data. It also appears that they've held public meetings in Flint, resulting in concerns about the safety of the water that have arisen in the last few days."

401.    On the same day, Dr. Mona Hanna-Attisha requests from Scott and others at MDHHS full state records on blood tests, likely to compare to her own data. She notes "[s]ince we have been unable to obtain recent MCIR blood lead data for Flint kids in response to the lead in water concerns, we looked at all the blood lead

levels that were processed through Hurley Medical Center[.]" She tells the MDHHS that despite being denied data access from the state, she has found "striking results."

402.    Dr. Hanna-Attisha had heard complaints from Flint residents about their water and found out that no corrosion control was being used.

403.    She developed a study using her hospital's data, comparing lead levels in blood samples taken before and after the switch in the water supply.

404.    On September 24, 2015, Dr. Hanna-Attisha released a study showing an uptick in post-water- transition elevated blood-lead levels in Flint children at a press conference.

405.    Dr. Hanna-Attisha had revealed the truth regarding lead poisoning that the MDHHS had made previous misrepresentations about.

406.    Earlier that day, MDHHS employee Angela Minicuci circulated a memorandum of "Flint Talking Points" in anticipation of Dr. Hanna-Attisha's study. It noted that her results were "under review" by MDHHS, but that her methodology was different, implying that her methodology was unorthodox or improper. "Looking at the past five years as a whole provides a much more accurate look at the season trends of lead in the area," MDHHS claimed. "MDHHS data provides a much more robust picture of the entire blood lead levels for the Flint area."

407.     Also regarding Dr. Hanna-Attisha's findings, Governor Snyder's press secretary e-mailed a number of state employees the following: "Team, [h]ere's the data that will be presented at the Hurley Hospital press conference at 3 p.m. As you'll see, they are pointing to individual children, a very emotional approach. Our challenge will be to show how our state data is different from what the hospital and the coalition members are presenting today."

408.     Here again, the state was more concerned about protecting its own reputation, thereby allowing it to continue profiteering from sales of Flint River water than it was about the public health, welfare, safety and lives of Flint residents. It never addressed the most important question – what if Dr. Hanna- Attisha was right?

409.     Defendants and employees of MDHHS were uniformly dismissive of Dr. Hanna-Attisha's results. Wesley Priem, manager of the MDHHS Healthy Homes Section, wrote to MDHHS' Kory Groetsch: "This is definitely being driven by a little science and a lot of politics."

410.     The same day the results were released, Scott emailed  Peeler, noting that he had tried to "recreate Hurley's numbers," and says he sees "a difference between the two years, but not as much difference as they did."

411.     Despite the fact that this constitutes MDHHS's first internal concession that their own methodology could have been wrong, and that Flint children had been poisoned, Scott continued to conceal and withhold this information from the Flint

residents, adding "I'm sure this one is not for the public."

As this was going on, Professor Edwards forcefully requested blood lead data from Mr.Scott. In an email, the Professor notes that the state had failed to provide the records to Dr. Hanna-Attisha's team, and accusing the MDHHS of "raising...obstacles to sharing it with everyone who asks." Professor Edwards claims to have been requesting the data since August, and notes that he has sent Scott ten e-mails on the subject.

412.    The next day, Scott drafts a remarkable response, but never sends it to Professor Edwards on the advice of Peeler.

413.    Included in the would-be response: "I worked with you earlier this month to get data to you relatively quickly but did not manage to complete the process before I went on annual leave for several days. I neglected to inform you that I'd be away, and I apologize for not informing you." Despite the fact that Scott admitted to going on vacation and leaving an important task unfinished as a public health crisis unfolded, Peeler tells him to "apologize less."

414.    The day after Dr. Hanna-Attisha releases her study, the City of Flint issues a health advisory, telling residents to flush pipes and install filters to prevent lead poisoning.

415.    The same day, Scott responded to an email from colleagues about Detroit Free Press interest in doing a lead story.

416.    At 12:16 p.m., Free Press reporter Kristi Tanner sent an email to Angela Minicuci at MDHHS saying Tanner had looked at the lead increase in Flint as shown in DHS records between 2013-2014 and 2014-2015 and Tanner is concluding that the increase "is statistically significant."

417.    Scott writes to Minicuci: "The best I could say is something like this: 'While the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall.'"

418.    Nancy Peeler, also a party to the conversation, continued the obfuscation of the truth when she writes back to Scott and Minicuci: "My secret hope is that we can work in the fact that this pattern is similar to the recent past."

419.    This conversation unfolded the very day after Scott told Peeler that his own review of the data showed increased post-switch lead levels, but that his findings were not to be made public.

420.    Peeler and Scott intentionally concealed and withheld information about endangered public health, that they had a duty to disclose to the public, and actively sought to hide the lead poisoning epidemic that they had previously concealed and failed to disclose.

421.    Also on September 25, MDHHS's Lasher sent an email to  Muchmore, Wyant,  Wurfel, and others, repeating criticisms of Dr. Hanna-Attisha's findings

using quotation marks in reference to the "data" that she reviewed and calling her sample size into question.

422.   Those MDHHS employees not actively engaged in the cover-up show no urgency whatsoever to this public health crisis. Cristin Larder sent an e-mail to a number of colleagues: "After looking at the data Kristi sent you and talking with Sarah, I realize I do not have access to the data I need to answer her specific question about significance. I won't be able to get access before Monday. Sorry I wasn't able to be helpful right now."

423.   Angela Minicuci responded: "Not a problem, let's connect on Monday."

424.   The department apparently could not be troubled with a public health emergency on the weekend.

425.   As this public health crisis unfolded,  Snyder received briefings from Muchmore, which were more focused on political reputation preservation, thereby enabling the profiteering and price gouging to continue, than on the public health, safety and wellbeing of the people of Flint. Muchmore referred to the people raising concerns about Flint's lead as the "anti-everything group," and claimed that it was the responsibility of the City of Flint (which was under the exclusive control of the Emergency Manager which Snyder had installed, and who regularly reported to Snyder,  Dillon, and  Clinton regarding Flint) to "deal with it."

426.    On September 26, 2015,  Muchmore told Snyder that finding funds "to buy

local residents home filters is really a viable option," and had identified service lines to homes as a likely cause of the problem.

427. Snyder still took no action to protect the health, welfare and safety of Flint's predominately non-white residents while his subordinates continued to misrepresent that the water was safe, and to discredit those who presented evidence to the contrary.

428. On September 28, 2015, Wurfel publicly claims that the Flint situation is turning into "near hysteria," and saying of Dr. Hanna-Attisha's statements "I wouldn't call them irresponsible. I would call them unfortunate." He again falsely declares Flint's water safe.

429. On September 28, 2015, State Senator Jim Ananich sent a letter to Snyder, noting "[i]t is completely unacceptable that respected scientific experts and our trusted local physicians have verified that the City of Flint's drinking water is dangerous for our citizens, especially our most vulnerable young people." He called for immediate action, but the Governor continued to wait out the 2 ½ year clock.

430. The same day, MDHHS Director Lyon continues MDHHS's misrepresentations which discredited Dr. Hanna- Attisha's study, despite his own department's knowledge that it shows a real problem. In an e- mail, he stated: "I need an analysis of the Virginia Tech/Hurley data and their conclusions. I would like to make a strong statement with a demonstration of proof that the lead blood

levels seen are not out of the ordinary and are attributable to seasonal fluctuations. Geralyn is working on this for me but she needs someone in public health who can work directly with her on immediate concerns/questions."

431.    In blatant violation of state law, at all relevant times the state's "top doctor," MDHHS chief medical executive Dr. Eden Wells was attending to her responsibilities part time while also working at the University of Michigan.

432.    Dr. Wells did not become a full time state employee until February 1, 2016, and her mandatory responsibilities at the state prior to that time may have involved as little as eight (8) hours per week.

433.    Dr. Wells was the sole medical doctor working as an executive for MDHHS..

434.    Dr. Wells's predecessor, Dr. Gregory Holtzman, has noted that as a full time employee, he "kept quite busy."

435.    Other outsiders continued to put pressure on the MDHHS to be more transparent about the lead poisoning issue; Genesee County Health Officer Mark Valacak wrote an e-mail to department employees, demanding "to know whether you have confirmed with the lead program staff at MDHHS that the state results that purport that lead levels have not shown a significant increase since the changeover of the water supply for the city of Flint indeed represent Flint city zip codes only and not Flint mailing addresses. As I mentioned to you both this morning, Flint mailing addresses include outlying areas like Flint and Mundy

Townships which obtain their water from the Detroit water authority."

436.    Valacak's email pointed out further obvious, known flaws in MDHHS lead testing methodology.

437.    In the face of continued state denials, a September 29, 2015, article in the Detroit Free Press publicly claimed "Data that the State of Michigan released last week to refute a hospital researcher's claim that an increasing number of Flint children have been lead-poisoned since the city switched its water supply actually supports the hospital's findings, a Free Press analysis has shown. Worse, prior to the water supply change, the number of lead-poisoned kids in Flint, and across the state, had been dropping; the reversal of that trend should prompt state public health officials to examine a brewing public health crisis."

438.    Dr. Hanna-Attisha could see the problem and the Free Press could see the problem with the state's own data, and yet the MDHHS found signs of a lead problem but failed to disclose it and ignored it.

439.    Finally, Snyder was forced to admit that there was an emergency he could no longer ignore.

440.    His Executive Director sent an e-mail on September 29, 2015 to Muchmore, Lyon, and Wyant, among others, soliciting information for a meeting regarding emergency management and noting that Dr. Wells "should be speaking with Hurley."

441.    A September 29, 2015, internal e-mail between MDHHS employees refers to the situation in Flint as sounding "like a third world country" and openly wondering when the federal government might be able to step in.

442.    The same day, MDHHS employees discuss efforts made by Genesee County to obtain MDHHS data. Ms. Lasher writes "I understand that we are still reviewing the data – but the county has basically issued a ransom date that they want this information by tomorrow... Eden – please coordinate an answer so Nick can walk into the 1 p.m. (meeting with the governor) prepared on this."

443.    As demonstrated in Ms. Lasher's email, the state continued to refuse to take even the simplest measure to protect public health until outsiders forced it to do so.

444.    Also on September 29, 2015, Geralyn Lasher e-mailed Peeler and Wells, Scott, and several others at MDHHS: "Is it possible to get the same type of data for just children under the age of six? So basically, the city of Flint kids ages six and under with the same type of approach as the attached chart you gave us last week?"

445.    Linda Dykema responds to fellow MDHHS employees including Wells: "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases."

446.    Wells' only reply to that email was a single word: "Agree", showing MDHHS continuing efforts to mislead the public, protect itself, run out the clock,

and discredit Dr. Hanna-Attisha, while the profiteering and price gouging of the citizens of Flint continued.

447.    The MDHHS and its employees were completely disinterested in the truth or finding out whether it may have made an error.

448.    When Dr. Hanna-Attisha directly e-mailed Wells with updated findings that isolated certain high risk areas of the city and showed that blood lead levels have "more than tripled," Defendant Wells responded that the state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public.

449.    While discouraging her department to look further into Dr. Hanna-Attisha's findings and misleading Dr. Hanna-Attisha, Wells remained focused on a single task; saving face at the expense of Flint's residents with a depraved indifference to the health, safety, welfare and property of the predominately non-white citizens of Flint, while the profiteering and price gouging continued.

450.    Also on September 29, 2015, Genesee County issued its own health advisory about Flint's water. Two days later, the county warned Flint residents not to drink the water.

451.    As the lead crisis unfolded, the state also obscured the cause of Flint's Legionnaires' disease outbreak. Because of the common cause, the lack of corrosion control, this effort further hindered outside efforts with respect to the lead

problem.

452.     The state actively prevented interested federal officials from becoming involved in the Legionnaires' investigation.

453.     A Centers for Disease Control and Prevention ("CDC") employee wrote to Genesee County Health officials in April of 2015: "We are very concerned about this Legionnaires' disease outbreak…It's very large, one of the largest we know of in the past decade, and community-wide, and in our opinion and experience it needs a comprehensive investigation."

454.     That e-mail added "I know you've run into issues getting information you've requested from the city water authority and the MI Dept. of Environmental Quality. Again, not knowing the full extent of your investigation it's difficult to make recommendations, and it may be difficult for us to provide the kind of detailed input needed for such an extensive outbreak from afar."

455.     On December 5, 2015, an employee of Genesee County Health Department accused state officials of covering up their mishandling of Flint's Legionnaires' disease outbreak. Tamara Brickey wrote to colleagues that "[t]he state is making clear they are not practicing ethical public health practice." Further, "evidence is clearly pointing to a deliberate cover-up," and "[i]n my opinion, if we don't act soon, we are going to become guilty by association."

456.     On October 1, 2015, the MDHHS officially confirmed Dr. Hanna-Attisha's

results. Department employees developed a "talking points" memorandum that gently admitted that further analysis of their own data supported the doctor's findings, but misleadingly cited lead paint as a greater concern than the water.

457. Finally, after months of denial, obstruction, and lies, during which the profiteering and price gouging of the residents of Flint continued, the state began to act on October 2015. Snyder received a proposal to reconnect Flint to DWSD and worked on plans for lead testing and water filters.

458. Still, Snyder's "comprehensive action plan" misrepresented that "[t]he water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets."

459. On October 15, 2015, Shekter Smith sent an email to Wurfel and others, stating that prior to the switch to Flint River water, "Staff believed that it was appropriate to monitor for two 6-month rounds of sampling to determine if additional measures were necessary. Based on the sampling performed, the city is required to install corrosion control treatment…A pilot test was not required or conducted. Staff believed that it was appropriate to monitor for two 6-month rounds to determine if additional measures would be necessary."

460. It was not appropriate to continue to delay by monitoring for two 6 month rounds, during which the residents of Flint were being exposed and re exposed to

lead, additional measures had been necessary from the beginning and prior to the switch to Flint River water.

461.    The state's staggering "drink first, test later" approach shows a conscious, willful disregard with depraved indifference to the health, safety, welfare and property to the predominately non-white citizens of Flint.

462.    On October 16, 2015, Flint reconnected to DWSD.

463.    However, the lead exposure and re exposure damage had been done, as was the damage to the Flint water delivery infrastructure, and lead has continued to leach from pipes into the water system.

464.    Two days later,  Wyant admitted the colossal failure that his department had made, many months after it was expressly brought to their attention.

465.    Wyant informed Snyder that " DEQ staff made a mistake while working with the city of Flint. Simply stated, staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not." Also; "simply said, our staff believed they were constrained by two consecutive six- month tests. We followed and defended that protocol. I believe now we made a mistake. For communities with a population above 50,000, optimized corrosion control should have been required from the beginning. Because of what I have learned, I will be announcing a change in leadership in our drinking water program."

466.    Wyant admitted to the Detroit News that MDEQ's "actions reflected

inexperience, and our public response to the criticism was the wrong tone early in this conversation."

467.    Apparently, by "early in this conversation," Wyant meant "until today."

468.    On October 21, 2015, roughly more than 16 months after Governor Snyder's Emergency Manager had forced the City of Flint to switch from being purchasers of Detroit water, in favor of profiteering by becoming purveyors of Flint River water to the residents of Flint, Snyder appointed a five person task force to investigate the Flint water crisis. The task force included Ken Sikkema, senior policy fellow at Public Sector Consultants, Chris Kolb, president of the Michigan Environmental Council, Matthew Davis, a professor of pediatrics and internal medicine at the University of Michigan, Eric Rothstein, a private water consultant, and Lawrence Reynolds, a Flint pediatrician.

469.    The day before the task force's findings were released, Snyder's new chief of staff wrote to him that "[i]f this is the path that the Task Force is on, it is best to make changes at DEQ sooner rather than later. That likely means accepting Dan's resignation. It also means moving up the termination of the 3 DEQ personnel previously planned for Jan 4 to tomorrow."

470.    On December 29, 2015, the task force issued a letter detailing its findings.

471.    In that letter, the task force stated that "[w]e believe the primary responsibility for what happened in Flint rests with the Michigan Department of

Environmental Quality (MDEQ). Although many individuals and entities at state and local levels contributed to creating and prolonging the problem, MDEQ is the government agency that has responsibility to ensure safe drinking water in Michigan. It failed in that responsibility and must be held accountable for that failure."

472.   The role of the MDEQ is to ensure compliance as the primary agency having enforcement responsibility for the Flint water system."

473.   The letter indicated that the MDEQ had failed to properly interpret and apply the Lead and Copper Rule.

474.   The letter pointed to a "minimalist approach to regulatory and oversight authority" at MDEQ's Office of Drinking Water and Municipal Assistance (headed by Shekter Smith) which "is unacceptable and simply insufficient to the task of public protection. It led to MDEQ's failure to recognize a number of indications that switching the water source in Flint would-and did- compromise both water safety and water quality."

475.   The letter also noted that "[t]hroughout 2015, as the public raised concerns and as independent studies and testing were conducted and brought to the attention of MDEQ, the agency's response was often one of aggressive dismissal, belittlement, and attempts to discredit these efforts and the individuals involved."

476.   Further, that "the MDEQ seems to have been more determined to discredit

the work of others—who ultimately proved to be right—than to pursue its own oversight responsibility."

477.    Regarding other failures of the state, the report noted that "we are particularly concerned by recent revelations of MDHHS's apparent early knowledge of, yet silence about, elevated blood lead levels detected among Flint's children."

478.    "The City of Flint's water customers—fellow Michigan citizens—were needlessly and tragically exposed to toxic levels of lead through their drinking water supply." The report also notes that the state government should be responsible for remedying the tragedy, "having failed to prevent it."

479.    On October 26, 2015, the Detroit News published a column from Earley entitled "Don't blame EM for Flint water disaster." He asserted that the tragedy was caused by local leaders, ignoring the MDEQ's role and the fact that he and his fellow Emergency Managers had entirely usurped the authority of the local Flint elected officials, as approved and implemented by the approvals of Governor Snyder, Dillon, and Clinton.

480.    In October 2015,   Shekter Smith was reassigned so as to have no responsibility for Flint's drinking water.

481.    On December 14, 2015, the City of Flint declared a state of emergency.

482.    In response to a blog post by Professor Edwards entitled "Michigan Health Department Hid Evidence of Health Harm Due to Lead Contaminated Water.

Allowed False Public Assurances by MDEQ and Stonewalled Outside Researchers," the Governor's Communications Director wrote to Snyder and others "[i]t wasn't until the Hurley report came out that our epidemiologists took a more in-depth look at the data by zip code, controlling for seasonal variation, and confirmed an increase outside of normal trends. As a result of this process, we have determined that the way we analyze data collected needs to be thoroughly reviewed."

483.   In other words, MDHHS's failure to properly analyze its own data was a matter of practice, pattern, custom, and/or policy of depraved indifference to the health, safety,welfare and property of the citizens of Flint during the period of time that the City of Flint, under control of the Emergency Managers, as approved by Snyder, Dillon and Clinton, was used to facilitate unchecked profiteering  of tens of millions of dollars by becoming a purveyor of Flint River water and selling it at price gouging rates to the residents of the  City of Flint.

484.   On December 23, 2015, the Michigan Auditor General provided an investigative report on the crisis, finding that corrosion control should have been maintained from the beginning and that improper sample sites had been selected by the MDEQ.

485.   On December 30, 2015, Wyant and Wurfel resigned.

486.   On January 4, 2016, Genesee County declared its own state of emergency.

487.   On January 12, 2016, Snyder called the National Guard into Flint and

requested assistance from FEMA.

488.   On January 13, 2016, -Snyder announced the massive spike in Legionnaires' disease in Genesee County.

489.   The Governor's January 13, 2016 announcement was made ten months after the State was made aware that the spike coincided with the switch to Flint water.

490.   On January 16, 2016, President Barack Obama declared a Federal State of emergency in Flint.

491.   In his January 19, 2016, State of the State address, Snyder admitted to the people of Flint that "Government failed you at the Federal, State and local level."

492.   On January 21, 2016, EPA's Susan Hedman resigned over her involvement in the Flint Water crisis. Hedman had acted with deliberate indifference to the MDEQ's failures to follow federal law and guidelines, and helped to silence Mr. Del Toral.

493.   On January 21, 2016, the EPA issued an Emergency Order, based on its finding that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue."

494.   The Emergency Order included as Respondents the City of Flint, the MDEQ, and the state.

495.   The Emergency Order provided for the EPA to conduct its own sampling of lead in Flint's water and undertake other actions as part of a process "to abate the

public health emergency in the City of Flint."

496.     The Emergency Order notes that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river's water was corrosive and removed protective coatings in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

497.     The Emergency Order indicates that "water provided by the City to residents poses an imminent and substantial endangerment to the health of those persons. Those persons' health is substantially endangered by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

498.     Further, the EPA states that "The City, MDEQ and the State have failed to take adequate measures to protect public health."

499.     According to the Emergency Order: "Based upon the information and evidence, EPA determines that Respondents' actions that resulted in the introduction of contaminants, which entered a public water system and have been consumed and may continue to be consumed by those served by the public water system, present an imminent and substantial endangerment to the health of persons."

500.     In a public statement, EPA Administrator Gina McCarthy declared: "Let's be really clear about why we are here today…We are here today because a state-

appointed emergency manager made the decision that the city of Flint would stop purchasing treated water that had well served them for 50 years and instead purchase untreated — and not treat that water — and by law the state of Michigan approved that switch and did not require corrosion control. All to save money. Now that state decision resulted in lead leaching out of lead service pipes and plumbing, exposing kids to excess amounts of lead. That's why we're here."

501.     On January 22, 2016 Shekter Smith and Busch were suspended without pay.

502.     Shekter Smith's firing was announced on February 5, 2016.

503.     At one of several congressional hearings on the subject, EPA Deputy Assistant Administrator Joel Beauvias testified "MDEQ incorrectly advised the City of Flint that corrosion- control treatment was not necessary, resulting in leaching of lead into the city's drinking water… EPA regional staff urged MDEQ to address the lack of corrosion control, but was met with resistance. The delays in implementing the actions needed to treat the drinking water and in informing the public of ongoing health risks raise very serious concerns."

504.     Professor Edwards also testified before congress. He claimed that MDEQ "ignored warning sign after warning sign" before engaging in a cover-up. "One-hundred percent of responsibility lies with those employees at the Michigan Department of Environmental Quality. There's no question," he testified.

505. The residents of the City of Flint continue to this day to drink bottled and/or tap water, some with the benefit of a filter.

506. As of the date of filing, the state and federal governments are still conducting investigations into the acts herein described.

## CLASS ALLEGATIONS

507. Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and similarly situated individuals in the City of Flint, Michigan, subject to amendment and additional discovery as follows:

   a. All persons in the City of Flint who have been harmed by Defendants' racially motivated emergency fiscal plan, with depraved indifference, destroyed the infrastructure, exposed and re exposed to lead, and damaged by reducing the value of the property and businesses of the residents of the city of Flint.

   b. All persons in the City of Flint who have tested positive for the presence of lead in their blood, since April 25, 2014;

   c. All persons in the City of Flint who have experienced personal injury as a result of their exposure to toxins in Flint's drinking water supply, since

April 25, 2014; and

    d. All persons in the City of Flint who have owned property or businesses in Flint Michigan since April 25, 2014.

Excluded from the Class is:

    a. Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

    b. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; and

    c. All governmental entities.

508. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity & Ascertainability

509. This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1), given that the amount of affected Flint residents, property business owners, upon information and belief, has reached the tens of thousands, making individual joinder of class members' respective claims impracticable. While the precise number of class members is not yet known, the precise number can be ascertained

from U.S. Federal Census records, State of Michigan and City of Flint public records, and through other discovery. Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

## Typicality

510. Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of highly corrosive water from the Flint River into the public water supply, causing lead contamination and personal injury damages, destroying the infrastructure, and causing the ongoing water crisis in Flint. Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

## Adequacy of Representation

511. Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent. Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

{00019380 1 }

512. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.

## Predominance of Common Issues of Law

513. There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

a. Whether Defendants engaged in the conduct alleged herein Racketeer Influenced and Corrupt Organizations Act pursuant to 18 U.S.C. Sec 1962 (c) and (d).

b. Whether optimal corrosion control treatment was identified and implemented, as required by the Lead and Copper Rule, since April 25, 2014, when the switch to the Flint River was made;

c. Whether Defendants "continued to operate and maintain optimal corrosion control treatment", as required by the Lead and Copper Rule, pursuant to 40 C.F.R. §141.82(g);

d. The extent to which Defendants know about, in a coordinated and systematic series of denials as to intentional representations and misrepresentations that the water was safe and which was justifiably relied upon by the residents of the city of Flint known before and after

April 25, 2014 and said information was withheld as to  Plaintiffs and Class Members;

e.   Whether Defendants' conduct violated the 14th Amendment of  the Constitution of the United States, and other statutes, laws and rules, as set forth herein;

f.   Whether Defendants made unlawful and misleading representations or material omissions with respect to the safety of Flint's water supply; and

g.   Whether Plaintiff and Class Members are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

### <u>Superiority</u>

514.   The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action.  Given the great amount of Flint residents impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct. To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management

challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

## COUNT I - 42 U.S.C § 1983

### Violation of Constitution Article 14 Due Process and Equal Protection Clause selling toxic Flint River water only to predominately Black Community of Flint.

*All Plaintiffs against all Defendants except the State of Michigan, MDEQ, and MDHHS*

515.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

516.    The Flint River flows through the following 6 Michigan cities, townships and municipalities; Montrose, Flushing, Flint, Genesee, Columbiaville, and Lapeer, hereinafter known as Flint Municipalities.[3]

517.    Until 2014, all 6 Flint municipalities received their water from DWSD.

518.    In 2014 the city of Flint was required to switch from DWSD, to the unsafe Flint River water.

519.    The remaining 5 Flint Municipalities were permitted to remain on the DWSD water.

520.    The water from the Flint River was available for free and was sold to the residents of the City of Flint at the highest and price gouging  rates in the United

---

[3] https://en.m.wikipedia.org/wiki/Flint_River_(Michigan)

States and averaging annually just under $900.00.

521.    Over the 2 year period that the Flint River water was sold to the city of Flint residents approximately 30,000 households and businesses were billed for at price gouging rates and revenues  were collected from residents yielding roughly 50 million dollar profit (gross of labor and services).

522.    The population of the city of Flint was roughly 100,000 persons as compared to the total population of the remaining  Genesee County communities of roughly 325,000 persons.

523.    Had the Flint River water been sold to these other 5 municipalities the profits (gross of labor and services), were exponentially higher yielding millions of dollars of profit.

524.    This created a substantial economic motivation to sell the Flint River water to all Genesee County communities.

525.    Despite this massive economic opportunity and motivation to switch all Genesee County communities along the Flint River, said additional millions of dollars was forgone.

526.    Instead the  millions of dollar of gross profit,  the remaining Genesee County communities not only failed to avail themselves of same, but in addition, continued to pay the DWSD millions of dollars to purchase the safe DWSD water.

527.    When  combined  the  5  remaining  Flint  municipalities  forewent  both  the

millions of dollars of profit and paid out of pocket additional tens of millions of dollars to purchase the DWSD water.

528.   The reason for this rejection of this multimillion dollar windfall was racism.

529.   The city of Flint was predominately black and poor with impoverished residents.

530.   The majority of the city of Flint population is non-white at 65.4%.

531.   The remaining 5 municipalities along the Flint River and the other Genesee County communities had predominantly white residents, wealthier and with higher socioeconomic standing.

532.   This racial discrimination had been an ongoing problem in the State of Michigan which motivated the legislature to enact laws prohibiting it- See ELCRA MCL 37.2302.

533.   This racial discrimination constitutes a violation of the 14th Amendment right to "equal protections of the laws."

534.   The City of Montrose Michigan was 98.7% white.

535.   The City of Flushing Michigan was 94.8% white.

536.   The Township of Flushing Michigan was 87.5% white.

537.   The City of Columbiaville Michigan was 95.2% white.

538.   The City of Lapeer Michigan was 88.6% white.

539.   In contrast the city of Flint was only 34.6% white and was 65.4% non-white.

540.    As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) increased risk of cancer, cognitive deficits, lost earning capacity, aggravation of preexisting conditions, post traumatic stress disorder, contract damages and property damages (including but not limited to damaged plumbing, replace of the infrastructure and lost real property and business value), and punitive damages.


### COUNT II – 18 U.S.C. § 1962 (c) and (d)

### Civil RICO

***All Plaintiffs against Defendants Snyder, Dillon, Clinton, Muchmore, Brown, Kurtz, Earley, Ambrose,  Shekter Smith, Wyant, Wurfel, Busch, Cook, Prysby, Lyon, Wells, Peeler, Scott, Dykema, Croft, Glasgow, Rowe, LAN, and Veolia***

541.    Plaintiffs repeat and re-allege each and every allegation contained in this complaint with the same force and effect as if asserted herein.

542.    Plaintiffs furthermore incorporate all the facts and allegations contained in

plaintiffs' RICO case statement attached with this complaint as required by Standing Order in Civil RICO cases.

543. These RICO claims arise from 18 U.S.C. Sec. 1962 (c) and (d).

544. The RICO defendants named herein conspired to, and for approximately two years did, intentionally and knowingly misrepresented the suitability and safety of the Flint River to Flint's residents on a repeated basis, that permanently damaged the structural integrity of the Flint infrastructure, and reduced the value of the property and businesses of the residents of the city of Flint

545. Numerous other bad actors including The State of Michigan, MDEQ, MDHSS, and The City of Flint participated in the conspiracy and association in fact enterprise set forth herein. These government actors are referred to as "RICO enterprise actors" herein due to the fact they cannot be named as RICO defendants.

546. This conspiracy originated from Flint's fiscal emergency budget crisis.

547. Flint's fiscal emergency budget deficit could have been safely addressed by invoking time tested, well-honed federal bankruptcy protections under the supervision of a Federal bankruptcy Judge, for restructuring the debts of municipalities.

548. A Federal Bankruptcy Judge would never approve the Emergency Manager Fiscal scheme as it endangered the public health and the structural integrity of the Flint water delivery system.

549.    While municipal bankruptcy was one of the solutions RICO Defendants Snyder, Dillon, Clinton and Michigan Emergency Managers were authorized to pursue, bankruptcy petitions for Flint were not filed.

550.    Instead, RICO defendant Snyder, through Emergency Managers and RICO defendants Earley, Brown, Kurtz, and Ambrose utilized their power and authority over the City of Flint to execute Flint's switch to the free but unsafe Flint River in April 2014, for purposes of price gouging and balancing the Flint budget.

551.    The switch to the unsafe free Flint River required coordinated efforts of the Rico enterprise actors named herein including The State of Michigan, MDEQ, MDHSS, and The City of Flint,  to ensure that the citizens of Flint could trust and rely on the safety and suitability of the Flint River water distributed to their homes and businesses.

552.    The switch to the unsafe Flint River required coordinated efforts of Rico defendants Rowe, LAN and Veolia herein with the Rico enterprise actors named herein, including the State of Michigan, MDEQ, MDHSS, and the City of Flint to ensure the citizens of Flint could trust and rely on the safety and suitability of the Flint River water distributed to their homes and businesses.

553.    The RICO defendants named herein acted in concert with the Rico enterprise actors to carry out the Emergency Fiscal scheme and conspiracy to balance Flint's

budget through the fraudulent sale and profiteering of unsafe Flint River water, and actively attempted to conceal the unsafe conditions that they caused.

## The RICO Defendants' Conspiracy to balance Flint's Budget Through the use of the Free Flint River

554.    The essence of this conspiracy through the Rico defendants and the Rico enterprise actors was to balance the City budget, by switching to a free water source and charging Flint residents, the highest rates in the nation for unsafe water.

555.    By using this fraudulent budget-balancing scheme, the Flint General Budget deficit of $12.9 million as of June 30, 2012 disappeared and by June 30, 2015 a positive General Fund Balance of $3.3 million was achieved.

556.    The RICO defendants never intended to use the free water of the Flint River as a permanent solution because they knew that the Flint River had not been proven to be safe to use as drinking water.

557.     Rather, the RICO defendants intended to discontinue buying safe water from Detroit in 2014 and to switch to buying the less expensive water from KWA in late 2016.

558.    However, there was a time gap of at least two years until the infrastructure to bring the KWA water to Flint was in place.

559.    From a government standpoint, this financial scheme and conspiracy started at the top with Snyder, Dillon, and Clinton.

560.    Snyder, Dillon, Clinton and their puppet  Emergency Managers' scheme to utilize the free Flint River as the primary water source, thereby enabling the city of Flint to balance its budget from the resultant revenue, required the use of the Rico enterprise actors and their employees to effectuate the scheme.

56l.    Snyder, Dillon and Clinton, through the Emergency Managers Brown, Kurtz, Earley, and Ambrose successfully forced Flint's switch to the free Flint River as a primary water source.

562.    Flint's Emergency Manager Ambrose would even veto the City of Flint's 7-1 City Council vote to disconnect from the unsafe Flint River on March 23, 2015.

563.    All the individual Rico defendants named herein imposed their will on Flint to remain connected to the unsafe Flint River after the powerless City Council voted to return to DWSD because of the unsafe conditions created by the Flint River.

564.    Despite Flint's City Council's vote to disconnect, which clearly demonstrated the city's knowledge that the free Flint River was unsafe as a water source, The city of Flint continued to charge Flint residents the highest rates in the nation for water known to be unsafe for use, and which permanently damaged the structural integrity of the infrastructure and property and businesses of the residents in the city of Flint.

565.    Snyder received actual knowledge and notice that there were very serious issues stemming from Flint's use of the free Flint River as primary water source, because this information was communicated to him through his staff including

Muchmore, detailing these very issues and unsafe conditions of the water beginning in October 2014.

566.    Snyder (himself, and through his Emergency Managers) insistence that the free Flint River be used as a primary water source to balance the City budget required the use of the Rico enterprise actors and their employees to effectively carry out this scheme.

567.    All the individual RICO defendants named herein, Snyder, Dillon, Clinton, Muchmore, Emergency Managers, Rico enterprise actors and their employees and agents, imposed their Emergency Fiscal Plan to profiteer by price gouging on free Flint River unsafe water to balance the City of Flint's budget onto unsuspecting and reliant city of Flint residents business and property owners.

568.    Pursuant to 18 U.S.C § 1962(c), the RICO defendants and the Rico enterprise actors committed culpable conduct giving rise to RICO liability.

569.    The RICO defendants named herein have identities, jobs, and roles that are separate and distinct from the association in fact enterprise that they formed as set forth herein.

570.    The RICO defendants, Shekter Smith, Wurfel, Wyant, Busch, Cook, Prysby, Croft and Glasgow, LAN, Rowe, and Veolia were responsible for monitoring the water and the water treatment plant and ensuring compliance with local state and Federal laws to ensure the Flint water treatment plant was not providing

contaminated, poisoned and  unsafe water for any use by city of Flint residents, business and property owners.

    a. The following laws Federal and State laws and regulations govern safe drinking water, including but not limited to:

        i. Michigan Safe Drinking Water Act, 1976 Public Act 399, MCL § 325.1001 – 325.1023, Michigan Department of Environmental Quality Guidance on Michigan Safe Drinking Water Act of 1976, EQC2050 (01/29/2003).

        ii. Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. § 1251 – 1376, EPA Lead & Copper Rule, 40 C.F.R. § 141, EPA Safe Drinking Water Act, 42 U.S.C. § 300, Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 1906 et seq. (see through § 9675), Federal Water Pollutants Control Amendments of 1972, 33 U.S.C. § 1319(c)(2).

571. RICO defendants, Shekter Smith, Wurfel, Wyant, Busch, Cook, Prysby, Rowe, LAN, Veolia, Croft, and Glasgow and Rico enterprise actor MDEQ and city of Flint were required to perform various testing procedures and verification processes under the above Federal and State laws, rules and regulations, to assure that the Flint River water was safe.

572. RICO defendants, Shekter Smith, Wurfel, Wyant, Busch, Cook, Prysby,

Rowe, LAN, Veolia, Croft and Glasgow knowingly failed to satisfy the above regulations that were required to verify that the water provided to the Flint residents, property and business owners was safe.

573.    James Henry, of the Genesee County Health Department, made several written and verbal requests for specific information starting October 2014, regarding the safety of Flint's water and potential health risks. Henry followed up these requests with a Freedom of Information Act request to the MDEQ on January 27, 2015 and requests for a meeting with MDEQ and Flint water plant staffers, Glasgow and Croft. The MDEQ, willfully denied the Genesee Health Department's document requests and further denied Henry's request for a meeting with the MDEQ and Flint water staffers.

574.    Each of the individual RICO defendants and Rico enterprise actors knew, and acquired actual knowledge and information through the dissemination of emails, through phone conversations, memos, scientific reports, testing, studies and assessments of the water, samples of the water, news stories, and public response correspondence that the water was untreated, unsafe and unfit for any use, including ingestion, yet continued to misrepresent, assure and reassure the residents, property and business  owners of the city of Flint that the water was safe for all uses, and which  information,representations, and reports they justifiably relied upon as true and accurate.

575.   RICO defendants and Rico enterprise actors knew, and acquired actual knowledge and information through the dissemination of emails, testing, studies, assessments, water sampling, phone conversations, memos, scientific reports, news stories, and public response correspondence that the water was untreated, unsafe and unfit for any use, including ingestion, yet continued to misrepresent, assure and reassure the residents, property and business owners of the city of Flint that the water was safe for all uses and there was not an uptick in the number of children diagnosed in the city of Flint with elevated blood lead levels after the connection the the Flint River.

576.   The RICO defendants and Rico enterprise actors set forth herein unjustifiably induced the reliance of Flint's residents to reasonably believe the water they were paying for was safe for all uses and treated so as to prevent harm to their properties, businesses, and homes.

577.   Reliance is clear under these circumstances as Plaintiffs and the putative class not only used the water, but paid and continued to pay bills for unsafe water in reliance on Rico Defendants and Rico enterprise actors, repeated, known representations and continued  misrepresentations that Flint's water was safe for use, despite Rico defendants and Rico enterprise actors evidence and knowledge to the contrary.

578.   The RICO Defendants and Rico enterprise actors  have committed and

{00019380 1 }

repeated numerous predicate acts of racketeering within the meaning of the RICO statute that constitute violations thereof including but not limited to 18 U.S.C. § 1961(1)(B), 18 U.S.C. 1341 and 1343 (both mail fraud and wire fraud), and 18 U.S.C. §1961(1)(D) (municipal bankruptcy).

579.   Specifically relating to bankruptcy, the following predicate acts by the RICO Defendants and Rico enterprise actors constitute violations of 18 U.S.C. § 152  (8), which states that "after filing of a case under Title 11 or in contemplation thereof, knowingly makes a false entries in  recorded information (including press releases, emails and correspondence to EPA, and others relating to the safety of the structural integrity of the infrastructure of the water delivery system, and the safety of the free Flint water, books, documents, records, and papers) relating to the property or financial affairs of the debtor……" which yielded in the illegal hazardous profiteering Emergency Fiscal scheme millions of dollars of revenue which were entered into the city of Flint books and records.

    a.   After Snyder's signing of PA 436 in 2012, addressing the Flint budgetary crisis, Flint's, state run government had a "choice" of four options to remedy the fiscal crisis: (i) a consent agreement, (ii) Chapter 9 municipal bankruptcy, (iii) mediation or (iv) the appointment of an Emergency Manager with similar broad powers to the prior statute's Emergency Manager.

b. Under PA 436, Flint had to contemplate filing a Chapter 9 municipal bankruptcy petition.   Upon information and belief, the government contemplated filing a chapter 9 bankruptcy petition but rejected this option and opted to appoint an Emergency Manager in furtherance of the over-arching fiscal scheme to balance the budget at all costs with a depraved indifference to the health, safety, welfare, property, infrastructure and businesses, of the citizens of Flint.  This was the first of two predicate acts.

c. Once Snyder appointed an Emergency Manager, instead of filing a Chapter 9 municipal bankruptcy, the Emergency Manager committed the second predicate.  Specifically, the Emergency Manager had to choose between the same three remaining options: (i) a consent agreement, (ii) a Chapter 9 municipal bankruptcy or (iii) mediation to remedy Flint's fiscal crisis. The Emergency Manager contemplated and rejected these options and instead he and his enterprise chose to deal with Flint's "Financial Emergency" by, inter alia, doing prohibited acts under bankruptcy Sec. 157(8), fraudulently misrepresenting assets.  The Emergency Manager opted to conceal and mitigate the financial emergency by fraudulently switching to an unsafe and free water source for the two year interstice when they terminated the water contract with DWSD in March 2013.  In so doing, the Emergency Manager allowed an estimated $50 million of toxic water to be sold to Flint

residents, as part of his budget balancing scheme.  This being done with a depraved indifference to the, health, safety, welfare and diminishing the value of the property and businesses of Flint residents.

d. This was fraudulent in that all knew they were switching to the unsafe, contaminated  but free water source from the Flint River in furtherance of the over-arching fiscal scheme to balance the budget at all costs with a depraved indifference destroying the infrastructure, and damaging the businesses and property of the residents of the city of Flint.

e. These acts were done in order to prevent the irate citizens of the City of Flint from knowing that the money cost-cutting plan to balance the budget and alleviate the City's Financial Emergency was to require them to buy and use unsafe water.

580.    The predicate acts committed by the Enterprise Actor City of Flint, under the auspices of RICO Defendants Snyder, Dillon, Clinton, Muchmore, and Emergency Managers who subsumed the City of Flint government, and RICO defendants named herein constitute mail fraud in violation of 18 U.S.C. § 1341 which says "Whoever, having devised or intending to devise any scheme or artifice to defraud………..for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, any such matter or thing, shall

be fined under this title or imprisoned not more than 20 years, or both" include the following predicate acts:

    a. RICO Enterprise Actor City of Flint had continuously mailed water bills for unsafe and poisonous water to Flint property and business owners on a monthly basis which fraudulently misrepresented that the City was providing property and business owners with safe water in exchange for consideration. These bills, delivered by way of the U.S. mail through interstate commerce and mailed back by Flint property owners, some of them out of state, by placing postage upon envelopes deposited in mailboxes and sent back through interstate commerce, constitute mail fraud by the City of Flint. Flint continued to mail these water bills that property and business owners were required to pay beginning for the April 2014 water and continuing until March 9, 2016, when the Mayor of Flint announced that the City would suspend water bill collection but continues to mail theses water bills through the present time

    b. The property and business owners of Flint were subject to the highest public water rates in the country. They were billed, on average, $864.32 annually for the toxic water they received which is well above the U.S. average of $316.20 for public water systems.

c. RICO Defendant Michael Glasgow, the water treatment plant's laboratory and water quality supervisor, informed the MDEQ by letter on April 16, 2014, that he was "expecting changes to our Water Quality Monitoring parameters, and possibly our Disinfection Byproduct monitoring on lead & copper monitoring plan... Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible... I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote to Rico enterprise actor MDEQ, including Rico Defendants Prysby and Busch, noting that he "assumed there would be dramatic changes to our monitoring. I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

d. On April 23, 2014 e-mail from RICO Defendant Busch to RICO Defendant Wurfel admits knowing that the Flint River drinking water it was selling Flint residents was an inconsistent low quality water source. In his email, Bush states that, "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

e. On April 25, 2014, The Flint Department of Public Works through Director and Rico Defendant Howard Croft issued a statement in a press release that was known to be false and therefore fraudulently represented to the public, "The test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect. We are proud of that end result." This statement was made at a time that Rico enterprise actor City of Flint was aware no corrosion controls were in place and that the Flint water treatment plant was not upgraded and therefore not ready to distribute water to Flint residents, in furtherance of the over-arching fiscal scheme to balance the budget at all costs by selling the residents of Flint toxic drinking water with a depraved indifference to health, safety, welfare of the property and business owners of Flint.

{00019380 1 }

f. Discussing General Motors' decision, Rico Defendant Prysby wrote to Rico Defendants Busch, Shekter Smith and others that the Flint River water had elevated chloride levels. He stated that "although not optimal" the water was "satisfactory." He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

g. On January 2, 2015, the Rico enterprise actor City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes in the Flint River, which was a product of attempting to disinfect the water. It was nonetheless claimed that the water was safe to drink for most people with healthy immune systems.

h. Rico Defendant Bradley Wurfel, MDEQ Director of Communications, issued a press release on September 2, 2015 stating "[W]e want to be very clear that the lead levels being detected in Flint drinking water are not coming from the treatment plant or the city's transmission lines… The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes….the results reported so far fail to track with any of the lead sampling conducted by the city. In

addition, Virginia Tech results are not reflected by the blood lead level testing regularly conducted by the state department." This false statement was made to direct blame for the untreated water from Rico Enterprise Actor MDEQ to the property owners' aged plumbing infrastructure in furtherance of the over-arching fiscal scheme to balance the budget at all costs with a depraved indifference for the health, safety and welfare, of the property and business owners of Flint.

i.   On September 9, 2015, Rico Defendant Bradley Wurfel of MDEQ again fraudulently misrepresented the quality of Flint's Water supply through publicly disseminated untrue statements in a local newspaper by stating, when he told a reporter: "[T]he state DEQ is just as perplexed by Edwards's results as he seems to be by the city's test results, which are done according to state and federal sampling guidelines and analyzed by certified labs." This statement was made with full knowledge that at least one EPA employee had told MDEQ that its testing was not being conducted according to federal guidelines.

j.   In a September 17, 2015 letter, Rico Defendant Dan Wyant (Director of MDEQ) wrote a response to an inquiry from various legislators, disavowing any responsibility for reacting to Mr. Del Toral's alarm-sounding memorandum: "With respect to the draft memo referenced in

your letter, the MDEQ does not review or receive draft memos from the USEPA, nor would we expect to while it is a draft." This statement was untrue as MDEQ had undeniably reviewed Miguel Del Toral's expert report that charged MDEQ with highly credible evidence of notice of the toxic threats facing Flint residents as a result of their failure to comply with the Lead & Copper Rule.

    k. On September 28, 2015, and after a significant uptick in infants showing elevated blood lead levels in Flint, Rico Defendant Bradley Wurfel issued another public statement again misrepresenting that Flint's water was safe.

581. The predicate acts committed by the RICO defendants and Rico enterprise actors constituting wire fraud in violation of 18 U.S.C. § 1343 (Fraud by Wire, Radio or Television) which says, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both" include:

    a. Plaintiff incorporates all items listed in the mail fraud section as these misrepresentations that fraudulently induced reliance of the Flint

community that the water supply was safe for use, clean, and worthy of consumption these misrepresentations were also transmitted by way of radio and television based media sources.

b. On April 25, 2014, RICO Defendant Mayor of Flint Dayne Walling, went on TV to alert the public of the switch to the Flint River as the City's primary water source. In doing so, Dayne Walling said ""It's regular, good, pure drinking water, and it's right in our backyard", and did so while knowing the City's water treatment facility had not had any of the necessary corrosion controls implemented by RICO Defendants, and Rico enterprise actors.

c. Furthermore, as property and business owners in Flint were receiving water bills that fraudulently induced reliance and payment for water that the RICO Defendants and Enterprise Actors  each had independent and collective knowledge was contaminated; many of the Flint property and business owners paid their bills online through the City of Flint website with credit cards or ACH or by returning the bill by mail with an enclosed check that was processed by their banks.  These water payments, which totaled an estimated $50 million were processed through the Federal banking system which included the use of wires.

d. This continued from the date of the original switch from the DSWD to the

Flint River on April 25, 2014 up and until Mayor Weaver suspended collection for water bills on March 9, 2016 all in furtherance of the over-arching fiscal scheme to balance the budget at all costs with a depraved indifference and damage to the property and business owners of Flint.

582.   Defendants utilized channels of interstate commerce through the use of U.S. Mail and wire based means for committing the RICO predicate acts set forth herein.

583.   The actions and inactions of the RICO defendants and Rico enterprise actors go beyond general negligence or recklessness and were done with knowledge and intent, as the facts indicate that all were engaged in a coordinated enterprise pattern of disseminating false information, and by knowingly ignoring statutes, rules and laws..

584.   The actions, inactions, misrepresentations, denials, violations, and cover ups of the Rico Defendants and Rico Enterprise Actors satisfies the 18 U.S.C. § 1961(5) definition of "pattern of racketeering activity" of at least two acts of racketeering activity that are sufficiently related.

585.   The RICO Defendants engaged in a "pattern of racketeering" because all the individual RICO Defendants and Rico Enterprise Actors, including but not limited to the city of Flint water treatment plant operators and staff, the MDEQ, and it's employees, the MDHHS, and it's employees, Rowe, LAN, and Veolia, and their employees continuously disseminated knowingly false information by way of mail,

wire, TV and other media mediums in a coordinated effort by all the RICO Defendants and Rico Enterprise Actors stating that the Flint River drinking water had been treated, tested, that the water was safe for use and worthy of payment, and attempting to discredit experts proclaiming Flint's water was unsafe, despite possessing both knowledge and evidence at all times that the Flint River water was unsafe and dangerous.

586.    The closed end continuity element under 18 U.S.C. § 1961(5) is satisfied by the fact that water bills were mailed to Flint property and business owners on a monthly basis from the time of the April 2014 hookup to the free Flint River through the present time until March 2016, when the City of Flint's Mayor suspended required payments for these water bills.

587.    The close-ended element of 18 U.S.C. § 1961(5) is satisfied because each of the individual RICO Defendants and the Rico enterprise actors were aware, beginning in 2012, that the purpose and goal of switching to the Flint River for water supply purposes was to connect to a free source of water, and bill for and collect money from said water to balance the Flint budget.

588.    The RICO Defendants' and Rico Enterprise Actors actions for over a two-year period amount to a continuous closed end pattern of racketeering within the meaning of the Civil RICO statute.

589.    On June 29, 2013, RICO Defendant ROWE met with representatives of Flint,

Genesee County Drain Commissioners Office and the MDEQ to discuss:

    a.  Using the Flint River as a water source;

    b.  The ability to perform the necessary upgrades to the Flint Water Treatment Plant;

    c.  The ability to perform quality control

    d.  The ability for Flint to provide water to Genesee County;

    e.  The ability to meet an April or May 2014 timeline; and

    f.  Developing a cost analysis.

590. According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects…" of the items previously referenced, and the following determinations were made:

    a.  The Flint River would be more difficult to treat, but was viable as a source;

    b.  It was possible to engineer and construct the upgrades needed for the treatment process;

    c.  It was possible to perform quality control "with support from Rico defendant LAN engineering which works with several water system around the state, quality control count be addressed[;]"

d. The Flint Water Treatment Plant did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

e. There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable;

f. The next steps were for LAN to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

g. The ability to meet an April or May 2014 timeline; and

h. Developing a cost analysis.

591. This 2013 meeting was actually a follow up analysis to a previously conducted Flint River viability study performed by Rico Defendant Rowe in 2011. The objectives and conclusions offered by Rowe and accepted by the RICO Defendants blatantly contradicted Rowe's previous 2011 feasibility study that expressed major concerns and which MDEQ employees knew of and agreed with that refuted the proposition that the Flint River could be utilized as a viable primary water source.

592. It was therefore known by Rico enterprise Actors, The City Of Flint, MDEQ, MDHSS, Snyder, Dillon, Clinton, Muchmore, and the Emergency Managers, that at the time of the 2013 Rowe/LAN engineering meeting, and Rowe's follow up report

{00019380 1 }

contradicted the original 2011 conclusions, and that at best, there were substantial steps that needed to be taken before distributing Flint River water to Flint residents before it could be done so safely and responsibly.

593.    The 2013 Rowe report set forth an illusory plan for upgrading the Flint water treatment plant for purposes of treating the Flint River water that would be distributed. Rowe's plan emphasized the need to implement corrosion controls and the continued involvement of the Rico defendants Rowe/LAN to maintain the system.

594.    The follow up report and plan presented by Rowe, and adopted by RICO Defendants LAN, the Emergency Manager, and Rico Enterprise Actors MDEQ and The City of Flint, was nothing more than  a paid for professional expert report controlled by the Emergency Manager to further legitimize and obfuscate the reckless and intentional switch to the Flint River and further the over-arching financial scheme of balancing Flint's budget.

595.    The necessary steps provided for in the Rowe report and adopted by Lan were knowingly never implemented prior to connecting to the Flint River on April 25, 2014 or at any time leading up the declared state of emergency in late 2015.

596.    The necessary steps provided for in Rowe's 2013 report were repeatedly said to have been implemented by Rico enterprise actor MDEQ, when it was known they were not.

597.   After public complaints began to apply pressure on the RICO defendants regarding Flint's water quality, Rico Defendant Veolia was retained and controlled by the Emergency Manager and paid to address and render expert opinion and reports to perpetuate the falsehood that  Flint's water quality met acceptable standards and was safe for use.

598.   RICO Defendant Veolia issued their report which was presented to a committee of Flint's City Council on February 18, 2015.  In the report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing."  In other words, Veolia publically declared Flint's poisonous water safe, while knowing full well that this was not the case.

599.   By taking no steps to combat corrosion prior to connecting to the Flint River on April 25, 2014, RICO Defendants Rowe, LAN and Veolia, knew as a matter of fact that they were aiding the Rico enterprise and perpetuated  the scheme and conspiracy of the RICO defendants to deliver and bill for untreated, unsafe, free but poisonous water.

600.   The signs of the Flint River's unsafe effects on the City's water system and infrastructure  began to surface almost immediately further confirming what the RICO defendants and Rico Enterprise Actors already knew, but chose to ignore and continued to misrepresent as safe.

601.   The fact that the City of Flint knowingly began distributing Flint River water without the necessary upgrades cited by the Rowe 2013 report is substantiated by Michael Glasgow's (The Water Quality Supervisor for Flint's water plant) correspondence to MDEQ dated April 16, 2014 directly notified MDEQ that the Flint Water Treatment Plant would not be ready to treat and/or distribute Flint River water "anytime soon".

602.   Michael Glasgow's clear warning to MDEQ and others that the Flint Treatment plant was not anywhere near ready for the Flint River transition was ignored and the Flint River became Flint's primary water source a mere 9 days after Glasgow issued the above correspondence.

603.   Almost immediately after the Flint River was connected as Flint's primary water source on April 25, 2014, the very issues of corrosive destabilization of prior metallurgically stable  infrastructure that were cited in the expert  reports of Rowe and LAN were realized when complaints began to pour in citing discolored and smelly water by the citizens of Flint.

604.   While Rico defendant Veolia proclaimed the water was safe to perpetuate the financial scheme of the Rico enterprise, the health impacts of the Flint River were readily apparent through a substantial uptick in infant lead poisoning cases during the 2014 and 2015 years.

605.   Rico enterprise Actor MDHHS not only failed to take action regarding the

uptick in known elevated infant blood lead levels, but actively and intentionally concealed this information and data that Flint's water supply was causing the City's residents to be lead exposed and re exposed  and infected with legionella and other bacteria.

606.    RICO defendants Lyon, Wells, Peeler, Scott and Dykema entirely deviated from their roles as employees of MDHHS and through their various roles and authority conveyed through their respective positions, actively concealed data and information they possessed and misrepresented to the public the health impacts of lead exposure and re exposures  that were known to exist and occurring in Flint.

607.    As a direct and proximate cause of the Individual RICO Defendants' and Rico enterprise actors actions pursuant to 18 U.S.C. 1962(c) and (d), the plaintiffs represented herein have suffered catastrophic losses to property value, the destruction of the infrastructure in the city of Flint, the loss of business, absorbed substantial costs to repair their corroded water systems, are forced to use and or purchase bottled water with no safe water supply available in Flint for consumption or any other type of suitable use, and been forced to pay the estimated $50 million for unsafe water thereby giving them sufficient standing to maintain this RICO cause of action.

## COUNT III - BREACH OF CONTRACT AND IMPLIED WARRANTY OF MERCHANTABILITY AND IMPLIED WARRANTY OF FITNESS UNIFORM COMMERCIAL CODE CT

## 174 OF 1962 440.2316 AND DUE PROCESS ART.14; DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

### *All Plaintiffs Against Defendants Flint,  State of Michigan, All Emergency Managers*

608.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

609.    Defendant City of Flint, as used by the State of Michigan and Emergency Managers reporting to Snyder, Dillon, and Clinton, billed for, by its statutes and by offering services to its residents, offered to sell by contract with the residents of the city of Flint, potable, as safe drinking water from the Flint River.

610.    Plaintiffs accepted the offer by utilizing Flint River water, agreeing to pay for this water, and tendering payment for this water.

611.    Plaintiffs and Defendant City of Flint, as used by the State of Michigan and its Emergency Manager who reported to Snyder, Dillon, and Clinton, entered into a contract for the purchase and sale of potable, safe drinking water.

612.    Defendant State of Michigan, through the Emergency Managers who reported to Snyder, Dillon and Clinton, overtook the local government of Flint and assumed and/or shared its duties under the contract to sell potable, safe drinking water to Plaintiffs.

613.    Defendants materially and irreparably breached the contract with Plaintiffs by failing to provide potable, safe drinking water, and instead providing harmful,

foul, contaminated water unfit for human consumption.

614.    The breach of contract includes, but is not limited to, the breach of the implied warranty of merchantability of the potable safe drinking water subject to the contract of sale, pursuant to the Uniform Commercial Code as adopted by the State of Michigan Act 174 of 1962 Section 440.2316.

615.    The breach of contract also includes, but is not limited to, the breach of implied warranty of fitness for a particular purpose of the potable safe drinking water subject to the contract of sale, pursuant to the Uniform Commercial Code as adopted by the State of Michigan Act 174 of 1962 Section 440.2316.

616.    The 14th Amendment of the U.S. Constitution was violated by the imposition of these contracts and the breaches of these contracts, because they constitute a taking of property without due process of law.

617.    It is a violation of due process because these contracts were imposed on Plaintiff's by the city of Flint, using the State of Michigan through the Emergency Managers who reported to Snyder, Dillon, and Clinton, and without the approval of the city of Flint duly elected officials, and without approval of Plaintiffs through their duly elected representatives of the city of Flint.

618.    As a result of Defendants' breach, Plaintiffs suffered damages in the amount of all debts and obligations for Flint water, whether tendered or not tendered, and as stated throughout this complaint.

619.    Furthermore, the actions of the City of Flint, State of Michigan, their respective executives, officers, agencies, and agents by disconnecting the City's water supply from the safe DWSD and instead relying on the free but unsafe waters of the Flint River, did cause a city wide diminution of property values for residences and businesses leaving the individual properties either uninhabitable or, in the cases of business, economically unviable to the point that the prices for said properties have been reduced to mere throwaway values.

620.    Defendants' actions did not advance any legitimate state interest and, on the contrary, caused city wide harm.

621.    Defendants' actions have damaged, irreparably harmed or destroyed significant portions of the City of Flint's water delivery infrastructure to such an extent that property owners, both residential and commercial, have suffered a severe diminution of their property values to such a point that they will either have to abandon the uninhabitable and/or unusable property or stay and be saddled with the unsustainable burden of paying for the rehabilitation of the City's water delivery system.

622.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' damages.

623.    As a direct and proximate result of the above Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered contract damages and

property damages (including but not limited to damaged plumbing, destruction of the Flint infrastructure, payment for water which was not safe to drink in violation of the implied warranties, lost business and real property value, and exemplary damages. In total the amount paid for a contractually unfit product should be refunded, disgorged, and taken back in excess of 50 million dollars.

## COUNT IV– 42 U.S.C. § 1983

## SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

*All Plaintiffs Against Defendants City of Flint, Walling, Croft, Glasgow, Snyder, Dillon, Clinton, Brown, Kurtz, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel,  Wells, Peeler, Lyon, and Scott*

624.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

625.   Amendment XIV to the Constitution of the United States of America provides in relevant part, that: "…nor Shall any State deprive any person of life liberty or property without due process of law."

626.   This protected "liberty" interests include the fundamental right to bodily integrity.

627.   Defendants knowingly and willfully violated the plaintiff's Constitutional right to bodily integrity by sending corrosives directly into the antiquated yet functional Flint water delivery system infrastructure.

628.   This State action, motivated by a plan to resolve a run of the mill fiscal crisis

in Flint, is a deliberate violation of Plaintiffs 14th Amendment rights to liberty, particularly bodily integrity.

629.   Like a great deal of American infrastructure, said Flint infrastructure was old and antiquated but metallurgically stable.

630.   State officials had the option of removing the lead containing antiquated delivery system in Flint, and replacing it with one that did not contain lead, but chose not to do so, before they approved and released corrosives into the water delivery system.

631.   Said infrastructure has always consisted of pipes which were comprised of metallic compounds which had remained metallurgically stable for over 50 years.

632.   The delivery of said corrosives caused destabilization to the structural integrity of the infrastructure and allowed metallic compounds to leach into the water delivery system.

633.   This destabilization and degradation stripped and separated the pipes' component element of lead (Pb) and released it into the homes, businesses and facilities of Flint.

634.   Plaintiffs ingested and otherwise were caused to be exposed and re exposed to this newly released element of lead.

635.   Lead is a well known potent neurotoxin for which the State of Michigan, its agents servants and employees has officially recognized.

636. Children under the age of 7 (seven), are particularly vulnerable and at risk to this neurotoxin as their brains are developing most rapidly at this time causing irreversible brain damage and developmental delays.

637. Lead causes and caused injuries to the plaintiffs including but not limited to irreversible brain damage, loss of IQ points, hyperactivity, mental retardation, learning disabilities, impaired executive functioning, kidney damage, elevated blood pressure, heart damage, loss of earnings potential, loss of impulse control resulting in violent and or criminal behavior, in utero exposure to unborn fetuses resulting in second generation lead exposed children, and premature death or other injuries.

638. Said exposure and re exposure requires immediate and life long medical and educational interventions, testing, evaluations, and painful chelation of blood.

639. In causing Plaintiffs to be exposed and re exposed to lead, Defendants maliciously, recklessly, wantonly, knowingly in bad faith, and/or in reckless disregard for Plaintiffs' constitutional rights /or made with deliberate indifference to public safety and welfare, exposed and re exposed Plaintiffs to a known and foreseeable risk of harm.

640. As a result of Defendants' actions and/or omissions, Plaintiffs suffered bodily harm and their Constitutional rights to bodily integrity were violated.

641. Defendants' actions shock the conscience of Plaintiffs and of any reasonable

person.

642.    Defendants unlawful conduct was part of the overall fiscal scheme to fix a run of the mill Municipal budget problem.

643.    Defendants deliberate actions were the proximate cause of the Plaintiffs' injuries.

644.    As a direct and proximate result of Defendants deliberate conduct, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation), cognitive deficits, lost earning capacity, aggravation of preexisting conditions, the need for a lifetime of medical monitoring, in utero exposure and re exposure to lead, and punitive damages.

## COUNT V- BREACH OF IMPLIED WARRANTY AND DUE PROCESS ART.14; DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

### *All Plaintiffs Against Defendants City of Flint and State of Michigan*

645.    Plaintiffs incorporate every allegation in this complaint as if fully restated

{00019380 1 }

herein.

646.   The State of Michigan and the City of Flint directly promised to provide water that was fit for human consumption and/or impliedly promised that the water was fit for human consumption.

647.   The State of Michigan and the City of Flint have both admitted that the water it supplied was contaminated, including being poisoned with lead, and therefore clearly not fit for its intended use of human consumption.

648.   The provision of water unfit for its intended purpose and/or the admission that the water was not fit for its intended purpose constitute material breaches of an implied warranty and/or contract.

649.   Defendants are liable to Plaintiffs and the putative class for all amounts billed and/or charged and/or collected, whether paid or unpaid, for water that was unfit for human consumption.

650.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

651.   As a direct and proximate result of the individual Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), increased risk of cancer, physical pain and suffering, mental anguish, fright and shock, disability,

denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) increased risk of cancer, cognitive deficits, lost earning capacity, aggravation of preexisting conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT VI– 42 U.S.C. § 1983

### SUBSTANTIVE DUE PROCESS – DEPRIVATION OF CONTRACTUALLY CREATED PROPERTY RIGHT

*All Plaintiffs Against Defendants City of Flint, Walling, Croft, Glasgow, State of Michigan, Snyder, Dillon, Clinton, Brown, Kurtz, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel*

652.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

653.    Plaintiffs possessed and were deprived of a state contract law created property right to purchase and receive safe, potable drinking water.

654.    Plaintiffs' right was created by the actions of the parties as well as under Section § 46-16 et. seq. of the Flint City Ordinance.

655.    Plaintiffs' right is so rooted in the traditions and conscience of the American people as to be ranked as fundamental and protected by the Constitution.

656.    Defendants violated Plaintiffs' property right when, ceasing to provide

Plaintiffs with safe, potable water, they provided Plaintiffs with poisonous, contaminated water.

657.   The violation of Plaintiffs' property right is not adequately redressed in a state breach of contract action.

658.   The violation of Plaintiffs' property right involved Defendants' failure to adequately train, supervise, and/or hire employees.

659.   Defendants' outrageous, deliberate acts and/or inaction in violating Plaintiffs' protected property right caused Plaintiffs to suffer injuries.

660.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

661.   As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) increased risk of cancer, cognitive deficits, lost earning capacity, aggravation of preexisting conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property

value), and punitive damages.

## Count VII – 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS – DEPRIVATION OF CONTRACTUALLY CREATED PROPERTY RIGHT

*All Plaintiffs Against Defendants City of Flint, Walling, Croft, Glasgow, State of Michigan, Snyder, Dillon, Clinton, Brown, Kurtz, Earley, Ambrose, MDEQ, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel*

662.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

663.    Defendants deprived Plaintiffs of their contractually based property right to purchase and receive safe, potable drinking water, without notice or hearing.

664.    Defendants have not provided Plaintiffs with just compensation for their taking of Plaintiffs' property interests.

665.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

666.    As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including

(without limitation) increased risk of cancer, cognitive deficits, lost earning capacity, aggravation of preexisting conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive damages.

## Count VIII- BREACH OF IMPLIED WARRANTY AND DUE PROCESS ART.14;

## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

### *All Plaintiffs Against Defendants Flint & The State of Michigan*

667.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

668.    The City of Flint used by the State of Michigan through the Emergency Managers who reported to Snyder, Dillon and Clinton, directly promised to provide water that was fit for human consumption and/or impliedly promised that the water was fit for human consumption.

669.    The City of Flint, the State of Michigan through its Emergency Managers who reported to Snyder, Dillon and Clinton,  have admitted that the water it supplied was contaminated, including being poisoned with lead, and therefore clearly not fit for its intended use of human consumption.

670.    The provision of water unfit for its intended purpose and/or the admission that the water was not fit for its intended purpose constitute material breaches of an

implied warranty and/or contract.

671.     The 14th Amendment of the U.S. Constitution was violated by the imposition of these contracts and the breaches of these contracts, because they constitute a taking of property without due process of law.

672.     It is a violation of due process because these contracts were imposed on Plaintiff's by the State of Michigan using the Emergency Managers who reported to Snyder, Dillon and Clinton and without the approval of the city of Flint duly elected officials, and without approval by Plaintiffs duly elected representatives of the city of Flint.

673.     Defendants are liable to Plaintiffs and the putative class for all amounts billed and/or charged and/or collected, whether paid or unpaid, for water that was unfit for human consumption.

674.     Defendants' actions have damaged, irreparably harmed or destroyed significant portions of the City of Flint's water delivery infrastructure to such an extent that property owners, both residential and commercial, have suffered a severe diminution of their property values to such a point that they will either have to abandon the uninhabitable and/or unusable property or stay and be saddled with the unsustainable burden of paying for the rehabilitation of the City's water delivery system.

675.     Defendants are liable to Plaintiffs and the putative class for the diminution

of their property values and/or the costs associated with the rehabilitation and replacement of the City's water delivery infrastructure.

676. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

677. As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), increased risk of cancer, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) increased risk of cancer, cognitive deficits, lost earning capacity, aggravation of preexisting conditions, contract damages and damages to property (including but not limited to damaged plumbing, destruction of the infrastructure, and diminution of real property and businesses value), and exemplary damages.

## Count IX- UNJUST ENRICHMENT

### *All Plaintiffs Against Defendants State of Michigan and City of Flint*

678. Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

679. Defendants have received the benefits of the funds paid by Plaintiffs for

contaminated water that was and is unfit for human consumption.

680.    Defendants have utilized these funds for the operation of the government(s) of Flint and/or Michigan.

681.    The retention of the benefit of the funds paid by Plaintiffs constitutes unjust enrichment in the amount of all funds paid for water that was unfit for human consumption.

682.    It would be unjust to allow Defendants to retain the benefit they obtained from Plaintiffs.

683.    Plaintiffs are entitled to exemplary damages.

## Count X –NEGLIGENCE/PROFESSIONAL NEGLIGENCE/GROSS NEGLIGENCE

### *All Plaintiffs Against Defendant Veolia*

684.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

685.    Veolia undertook, for consideration, to render professional expert services for the City of Flint which it should have recognized as necessary for the protection of Plaintiffs, the putative class, and/or their property.

686.    Veolia undertook to perform a duty owed to Plaintiffs and the putative class by the City of Flint and/or the State of Michigan.

687.    Based on its undertaking, Veolia had a duty to Plaintiffs and the putative

class to exercise reasonable care to protect that undertaking.

688.   Plaintiffs and the putative class relied on the City, State, and/or Veolia to perform the duty to inspect, test, make recommendations for and report properly regarding the City's water supply to make sure that it was safe.

689.   Veolia failed to undertake reasonable care and conduct as a professional engineering firm.

690.   Veolia failed to exercise reasonable care in testing the city's water system and issuing its interim and final reports and recommendations.

691.   Veolia failed to exercise reasonable care when it declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

692.   Veolia failed to exercise reasonable care when it represented that Flint's drinking water was safe.

693.   Veolia failed to exercise reasonable care when it discounted the possibility that problems unique to Flint's water supply were causing medical harms.

694.   Veolia failed to exercise reasonable care when it failed to warn about the dangers of lead leaching into Flint's water system.

695.   Veolia failed to exercise reasonable care when it did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing further lead contamination in Flint's water supply.

696.   Plaintiffs and the putative class suffered harm resulting from Veolia's

failures to exercise reasonable care to protect its undertaking.

697.   Veolia's failures to exercise reasonable care to protect its undertaking proximately caused the Plaintiffs' injuries and were entirely foreseeable.

698.   Veolia is liable to Plaintiffs and the putative class for all harms resulting to themselves and their property from Veolia's failures to exercise reasonable care.

699.   Veolia's is responsible for damages including without limitation, personal injuries, illnesses, exposure to toxic substances, destruction of the infrastructure and damage to property and businesses of the residents of the city of Flint, suffered by Plaintiffs and the putative class as a result of Veolia's failures to exercise reasonable care.

700.   Veolia's conduct and/or failure(s) to act constitute gross negligence  that rises to the level of recklessness because it was so reckless that it demonstrates a substantial lack of concern for whether an injury would result.

701.   Veolia's actions and/or omissions were a and/or the proximate cause of the Plaintiffs' injuries.

702.   As a direct and proximate result of Veolia's actions and/or omissions, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), increased risk of cancer, physical pain and suffering, mental anguish, fright and shock, disability, denial of

social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre existing  conditions, contract damages, destruction of the infrastructure  and damage to the property and businesses of the residents of the city of Flint, (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

### Count XI- NEGLIGENCE/PROFESSIONAL NEGLIGENCE/GROSS NEGLIGENCE

#### *All Plaintiffs Against Defendant LAN and Rowe*

703.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

704.   LAN and Rowe undertook, for consideration, to render professional expert services for the City of Flint which it should have recognized as necessary for the protection of Plaintiffs, the putative class, and/or their property.

705.   LAN and Rowe undertook to perform a duty owed to Plaintiffs and the putative class by the City of Flint and/or the State of Michigan.

706.   Based on its undertaking, LAN and Rowe had a duty to Plaintiffs and the putative class to exercise reasonable care to protect that undertaking.

707.   Plaintiffs and the putative class relied on LAN and/or Rowe to test,

recommend, report and implement as to safety of the water in connecting to the Flint River and as to the Flint water treatment plant with the duty to ensure as to required upgraded and the proper treatment of the new water source(s).

708. LAN and Rowe failed to exercise reasonable care in preparing for and executing the transition from treated DWSD water to untreated Flint River water.

709. LAN and Rowe failed to undertake reasonable care and conduct as a professional expert firms.

710. LAN and Rowe failed to exercise reasonable care when they did not implement corrosion control in a system containing lead pipes where new highly corrosive water was being introduced into the antiquated infrastructure and water delivery system.

711. Plaintiffs and the putative class suffered harm resulting from LAN and Rowe's failures to exercise reasonable care to protect their undertaking and make sure that safeguards were taken to upgrade the Flint water treatment plant. Plaintiffs and the putative class suffered harm resulting from LAN and Rowe's failures to exercise reasonable care to protect their undertaking and make sure that anti-corrosives were provided to combat corrosion of the antiquated infrastructure and water delivery system.

712. This failure and negligent acts caused the structural integrity of the previously metallurgically stable infrastructure to become unstable allowing the

element of lead to leach from and into the infrastructure.

713.   This failure and negligence in the failure to exercise reasonable care caused destruction of the infrastructure that cannot be repaired and must be replaced.

714.   LAN and Rowe's failures to exercise reasonable care to protect its undertaking proximately caused the Plaintiffs' personal injuries and property and business owners damages  and were entirely foreseeable.

715.   LAN and Rowe are liable to Plaintiffs and the putative class for all harms resulting to themselves and their property from their failures to exercise reasonable care.

716.   LAN and Rowe's liability includes without limitation personal injuries, illnesses, exposure to toxic substances, destruction of the infrastructure and loss of value to property and businesses of the residents of the city of Flint suffered by Plaintiffs and the putative class as a result of LAN and Rowe's failures to exercise reasonable care.

717.   LAN and Rowe's conduct and/or failure(s) to act constitute gross negligence that rises to the level of recklessness because it was so reckless that it demonstrates a substantial lack of concern for whether an injury would result.

718.   LAN and Rowe's actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

719.   As a direct and proximate result of LAN and Rowe's actions and/or

omissions, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), increased risk of cancer, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of preexisting conditions, contract damages, destruction of the infrastructure and loss of value to the businesses property of the residents of the city of Flint, (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## <u>COUNT XII – GROSS NEGLIGENCE</u>

***All Plaintiffs against Defendants Snyder, Muchmore, Walling, Croft, Glasgow, Kurtz, Earley, Ambrose, MDEQ, MDHHS, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Dykema, Peeler, Scott and The City of Flint***

720.     Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

721.     Defendants independently owed Plaintiffs and the putative class a duty to exercise reasonable care.

722.     Defendants undertook, for consideration, to perform a duty owed to Plaintiffs and the putative class by the City of Flint and/or the State of Michigan.

723.   Based on their undertakings, Defendants had a duty to Plaintiffs and the putative class to exercise reasonable care to protect that undertaking.

724.   Plaintiffs and the putative class relied on the City, State, and/or Defendants to perform the duty to ensure the proper treatment of Flint River Water.

725.   Plaintiffs and the putative class relied on the City, State, and/or Defendants to perform the duty to disclose known hazards in their drinking water.

726.   Defendants failed to exercise reasonable care.

727.   Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

  a.  Failing to require corrosion control treatment of Flint River water;

  b.  Failing to conduct proper testing of Flint's water;

  c.  Failing to require proper testing of Flint's water;

  d.  Failing to respond to evidence that Flint's water was improperly treated;

  e.  Misrepresenting that corrosion control treatment had been implemented;

  f.  Publicly declaring unsafe water to be safe to drink;

  g.  Ignoring evidence that Flint's water was unsafe to drink;

  h.  Withholding information that showed that Flint's water was unsafe to drink;

  i.  Publicly discrediting those who claimed that Flint's water may not be safe to drink;

{00019380 1 }

j. Failing to warn Plaintiffs the public that Flint's water was not safe to drink.

728. Plaintiffs and the putative class suffered harm resulting from Defendants' failures to exercise reasonable care.

729. Plaintiffs and the putative class suffered harm resulting from Defendants' failures to exercise reasonable care to protect their undertakings.

730. Defendants' failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

731. Defendants are liable to Plaintiffs and the putative class for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

732. Defendants' liability includes without limitation personal injuries, illnesses, exposure to toxic substances, and property damage suffered by Plaintiffs and the putative class as a result of Defendants' failures to exercise reasonable care.

733. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

734. All of the above individual Defendants' conduct and/or failure to act constitute gross  that rises to the level of recklessness because it demonstrates a substantial lack of concern and wanton disregard for whether injury would result.

735. As a direct and proximate result of the above individual Defendants' conduct

and/or failures to act, Plaintiffs and the putative class have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages, destruction of the infrastructure and loss of value to the  property and businesses of the residents of the city of Flint,  (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs request that the Court grant them:

    a.  An order certifying one or more classes pursuant to Fed. R. Civ. P. 23;

    b.  An order declaring the conduct of Defendants unconstitutional;

    c.  An order declaring the Defendants liable for each Cause of Action as stated above;

    d.  Compensatory damages, including for injuries to person and property as outlined herein;

e.  Treble damages for property damage, destruction of the infrastructure and loss of business and financial loss under the Civil Rico Statute.

f.  Legal Fees and Attorney's fees under the Civil RICO Statute

g.  Compensatory damages for unjust enrichment

h.  Compensatory damages for future costs associated with necessary medical monitoring, early diagnosis, and future medical care.

i.  Consequential damages;

j.  Punitive damages as appropriate;

k.  Any and all other damages as outlined above;

l.  Reasonable attorneys' fees and litigation expenses; and

such other relief as this Court may deem fair and equitable, including but not limited to injunctive relief.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: August 12,  2016

**BERN RIPKA, LLP**

By: *_/s/ Chet Kern_____*

{00019380 1 }

Chet Kern, Esq.
Marc J. Bern, Esq.
60 East 42nd Street, Suite 950
New York, NY 10165
(212) 702-5000
ckern@bernripka.com
mbern@bernripka.com


**1-800-LAW-FIRM, PLLC**

By: */s/ Ari Kresch*
    Ari Kresch (P29593)
    26700 Lahser Rd, Suite 400
    Southfield, MI 48033
    (248) 565-2099
    akresh@1800lawfirm.com


**EXCOLO LAW, PLLC**

By: */s/ Solomon M. Radner*
Solomon M. Radner (P73653)
26700 Lahser Rd, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com